Rollin HAFFER, et al.

v.

TEMPLE UNIVERSITY OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, et al.

Civ. A. No. 80–1362.

United States District Court, E.D. Pennsylvania.

Oct. 30, 1987.

On Motion for Reconsideration Jan. 15, 1988.

Arthur Bryant, Washington, D.C. (Trial Lawyers for Public Justice), Ellen Vargyas, Washington, D.C. (National Women's Law Center), William Hangley, Philadelphia, Pa., for plaintiffs.

Robert J. Reinstein (Mary Ellen Krober), University Counsel, John B. Langel, Philadelphia, Pa., for defendants.

## OPINION

JOSEPH S. LORD, III, Senior District Judge.

### INTRODUCTION

This is a class action alleging unlawful gender discrimination in Temple University's intercollegiate athletic program. The plaintiff class consists of "[a]ll current women students at Temple University who participate, or who are or have been deterred from participating because of sex discrimination in Temple's intercollegiate athletic program." Plaintiffs' claims focus on three basic areas: (a) the extent to which Temple affords women students fewer "opportunities to compete" in intercollegiate athletics; (b) the alleged disparity in resources allocated to the men's and women's intercollegiate athletic programs; and (c) the alleged disparity in the allocation of financial aid to male and female student athletes. Plaintiffs claim that the treatment of women student athletes in each of these areas violates the fourteenth amend-

ment's equal protection clause[1] and the Pennsylvania Equal Rights Amendment. Plaintiffs also claim that the distribution of financial aid violates Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX").[2]

Defendants have moved for summary judgment. Defendants' motion is supported by a lengthy legal memorandum, two expert reports, numerous affidavits and well over fifteen hundred pages of deposition testimony. Plaintiffs have filed a motion, supported by over eight hundred pages of depositions and exhibits, to strike the expert reports. Plaintiffs' memorandum in opposition to defendants' motion for summary judgment ("Plaintiffs' memorandum") is supported by twenty-nine exhibits. In addition, defendants' reply memorandum and plaintiffs' memorandum of law in further opposition to defendants' motion for summary judgment are before me, as are exhibits and other evidence submitted in connection with plaintiffs' motion for a preliminary injunction. Review of this evidence reveals many genuine issues of material fact.

As the parties advance radically divergent views of the law applicable to plaintiffs' federal constitutional claims, I will first discuss the applicable legal standards. I will then examine whether the evidence produced by plaintiff is sufficient to raise a genuine issue of material fact on these claims. Next, I will briefly discuss plaintiffs' state constitutional claims. Finally, I will consider plaintiffs' Title IX claim.

*Federal Constitutional Claims*

I.

This appears to be the first case to challenge the operation of an intercollegiate athletic program on federal equal protec-

tion grounds. The existing case law, primarily involving equal protection challenges to various high school athletic programs, is of limited value. However, it is helpful to review briefly the reported cases, to extract certain principles courts have applied in these cases, and to identify certain arguments that courts generally accept.

In *Blair v. Washington State University,* 108 Wash.2d 558, 740 P.2d 1379 (1987) (en banc), plaintiffs alleged that defendants' intercollegiate athletic program discriminated against female student athletes in violation of state law. The trial court found that

> The women's athletic program [received] inferior treatment in funding, fundraising efforts, publicity and promotions, scholarships, facilities, equipment, coaching, uniforms, practice clothing, awards, and administrative staff and support. During the 1980–81 school year ... the total funding available to the men's athletic programs was $3,017,692, and for the women's programs was $689,757, roughly 23 percent of the men's.... Although the number of participation opportunities for men increased by 115 positions from 1973–74 to 1980–81, the opportunities made available for women decreased 9 positions during the same period.

*Id.* at 561, 740 P.2d at 1380–81.

The trial court ordered that the women's program receive a specified percentage of the funds allocated to intercollegiate athletics, and that this percentage be increased each year by 2 percent until it corresponds to the percentage of women undergraduates at the University. The trial court further provided that "the level of support for women's athletics was not required to

---

1. These claims are properly brought under 42 U.S.C. § 1983, as Temple's programs constitute state action for purposes of the fourteenth amendment. *See Krynicky v. University of Pittsburgh,* 742 F.2d 94 (3d Cir.1984), *cert. denied,* 471 U.S. 1015, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985).

2. Originally, plaintiffs' entire case was based on alleged violations of Title IX. *See Haffer v. Temple University,* 524 F.Supp. 531 (E.D.Pa.

1981) *aff'd,* 688 F.2d 14 (3d Cir.1982). After the Supreme Court decided *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), I ordered plaintiffs to strike all aspects of their Title IX claim except those regarding the "athletic scholarship and financial aid program." *See* Order of February 14, 1985. At that time, plaintiffs were granted leave to file an amended complaint, which added the federal and state constitutional claims.

exceed by more than 3 percent the actual participation rate of women in intercollegiate athletics at the University, excluding football participation from the comparison." *Id.* at 562, 740 P.2d at 1381. Similarly, the court ordered that women receive a specified percentage "of all money expended for scholarships, excluding funds expended for football scholarships." *Id.* at 562, 740 P.2d at 1381. This percentage is to increase yearly until it equals the percentage of women undergraduates. Finally, the University was ordered "to allow for increased participation opportunities until female participation, again excluding football participation from the comparison, reached a level commensurate with the proportion of female undergraduate students." *Id.* at 563, 740 P.2d at 1381.

Plaintiffs appealed various aspects of the trial court's order. The Washington Supreme Court held that the trial court abused its discretion in constructing remedies that excluded football from the relevant calculations. "[T]he Equal Rights Amendment contains no exception for football." *Id.* at 566, 740 P.2d at 1383. However, the state Supreme Court refused to modify that portion of the order which permitted the University to exclude revenue generated by a particular sport from calculations of the University's overall financial support. The Court found that exclusion of such revenues was "neither required nor prohibited by applicable law," and specifically held that the trial court "acted within its discretion" in permitting such exclusions. *Id.* at 567, 740 P.2d at 1384.

Numerous cases have challenged regulations that prohibit girls from participating in a particular high school sport or sports. In general, courts have had little difficulty in concluding that such regulations deny girls the equal protection of the laws. *See Hoover v. Meiklejohn,* 430 F.Supp. 164 (D.Colo.1977) (striking a regulation prohibiting girls from playing on high school soccer team); *Brenden v. Independent School Dist.,* 477 F.2d 1292 (8th Cir.1973) (striking a regulation barring girls from competing against boys in tennis, cross country skiing and cross country running). *See also Morris v. Michigan State Board of Education,* 472 F.2d 1207 (6th Cir.1973) (affirming preliminary injunction striking regulation prohibiting girls from competing on tennis team); *Force by Force v. Pierce City R–VI School Dist.,* 570 F.Supp. 1020 (W.D.Mo. 1983) (striking rule prohibiting females from trying out for football team); *Leffel v. Wisconsin Interscholastic Athletic Ass'n,* 444 F.Supp. 1117 (E.D.Wis 1978) (striking regulation prohibiting girls from trying out for boy's teams); *Carnes v. Tennessee Secondary School Athletics Ass'n,* 415 F.Supp. 569 (E.D.Tenn.1976) (preliminarily enjoining enforcement of rule prohibiting girls from playing on baseball team); *Clinton v. Nagy,* 411 F.Supp. 1396 (N.D.Ohio 1974) (granting temporary restraining order against enforcement of rule prohibiting girls from playing football); *National Organization for Women v. Little League Baseball, Inc.,* 127 N.J.Super. 522, 318 A.2d 33, *aff'd,* 67 N.J. 320, 338 A.2d 198 (1974) (striking rule prohibiting girls from participating in little league baseball).

Courts have had more difficulty with rules prohibiting boys from participating on girl's teams. In *Clark v. Arizona Interscholastic Ass'n,* 695 F.2d 1126 (9th Cir. 1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 79, 78 L.Ed.2d 90 (1983), *Petrie v. Ill. High School Athletic Ass'n,* 75 Ill.App.3d 980, 31 Ill.Dec. 653, 394 N.E.2d 855 (1979) and *Mularadelis v. Haldane Central School Board,* 74 A.D.2d 248, 427 N.Y.S.2d 458 (1980) such rules were upheld. These courts relied on the arguments that such regulations were substantially related to the important governmental interests in promoting overall equality of athletic opportunity, and in redressing past discrimination against women in athletics. *But see Gomes v. Rhode Island Interscholastic League,* 469 F.Supp. 659 (D.R.I.), *vacated as moot by time of appeal,* 604 F.2d 733 (1st Cir.1979) (exclusion of boys from volley ball team violates Title IX); *Attorney General v. Mass. Interscholastic Athletic Ass'n,* 378 Mass. 342, 393 N.E.2d 284 (1979) (exclusion of boys from girl's team violates state equal rights amendment).

The reported decisions reveal a heightened sensitivity to the history of sex discrimination in athletics, *see, e.g., Yellow Springs v. Ohio High School Athletic Ass'n,* 647 F.2d 651, 669–675 (6th Cir.1981), and a judicial endorsement of the policy of maximizing athletic opportunity for females. Although differential treatment, with respect to a particular sport, is permitted when the record reveals relevant physical differences, *Clark,* 695 F.2d at 1127, *Lafler v. Athletic Board of Control,* 536 F.Supp. 104, 106 (W.D.Mich.1982), overbroad and unsupported generalizations regarding the relative athletic abilities of males and females will be rejected. *Yellow Springs,* 647 F.2d at 657; *Brenden,* 477 F.2d at 1300–1301. Excluding girls from participation in particular sports for their own "safety" does not pass constitutional muster. *Force by Force,* 570 F.Supp. at 1030; *Fortin v. Darlington Little League, Inc.,* 514 F.2d 344 (1st Cir.1975). It is clear that the overall governmental goal to be achieved is equality of athletic opportunity for both sexes. *Clark,* 695 F.2d at 1132; *Gomes,* 469 F.Supp. at 666.

## II.

Turning to the instant case, to prove a fourteenth amendment violation plaintiffs must demonstrate not only that they have been adversely affected by state action, but that the disparate impact resulted from an invidious intent to discriminate. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Although the fourteenth amendment "does not take from the State all power of classification ... certain classifications ... in themselves supply a reason to infer antipathy." *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 271, 272, 99 S.Ct. 2282, 2292, 60 L.Ed. 2d 870 (1979). As "[c]lassifications based upon gender, not unlike those based upon race, have traditionally been the touchstone for pervasive and often subtle discrimination," *id.* at 273, 99 S.Ct. at 2293, they receive heightened judicial scrutiny. Thus, a threshold issue in this case is whether defendants' athletic program establishes a gender based classification.

At oral argument on plaintiffs' motion for a preliminary injunction, defendants' counsel strenuously argued that all teams were open to women, and that, in addition, certain teams were open to women only. Plaintiffs introduced many University publications discussing and listing "men's" and "women's" athletic teams, and pointed out that, in fact, all of Temple's intercollegiate athletic teams are and have been either exclusively male or exclusively female.[3] It appears that, for purposes of the instant motion, defendants concede "the fact that Temple sponsors separate teams for men and women." Memorandum of law in support of defendants' motion for summary judgment at 53. *See also* defendants' reply memorandum at 8 n. 8. The analysis that follows is based upon the assumption that Temple's intercollegiate athletic program explicitly classifies on the basis of gender.[4]

If plaintiffs can establish discriminatory treatment, then the fact that the challenged program is explicitly gender-based shifts the legal focus to defendants:

> [T]he party seeking to uphold [state action] that classifies individuals on the basis of their gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification. The burden is met only by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'

---

**3.** Until 1986, there were men's teams in the following sports: baseball, basketball, crew, cross country, fencing, football, golf, gymnastics, soccer, swimming, tennis, track and wrestling. Until 1986, there were women's teams in the following sports: badminton, basketball, bowling, cross country, fencing, field hockey, gymnastics, lacrosse, soft ball, swimming, tennis, track and volley ball. On May 13, 1986, Temple's Board of Trustees voted to eliminate the women's swimming, cross country, badminton and bowling teams, and the men's swimming, wrestling, fencing and cross country teams. The Board also voted to add a women's crew team.

**4.** Temple is not precluded from attempting to prove at trial that all teams are open to women.

*Mississippi University for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) (citations omitted).

Defendants argue that, if all of Temple's intercollegiate athletic teams were open to both men and women, the overwhelming majority of team members would be men.[5] Plaintiffs point to no evidence that contests this assertion. Sponsoring separate men's and women's teams therefore appears to expand substantially the opportunity for women to participate in intercollegiate athletics. Case law establishes that expanding the number and quality of athletic opportunities available to women is an important governmental interest. *O'Conner v. Board of Education of School Dist. No. 23,* 645 F.2d 578, 581 (7th Cir.), *cert. denied,* 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed. 2d 619 (1981), *on remand,* 545 F.Supp. 376 (N.D.Ill.1982); *Hoover,* 430 F.Supp. at 170.

The question presented is whether there are constitutional limitations on the means Temple uses to pursue this interest. To be sure, Temple is not obligated to sponsor an intercollegiate athletic program, just as the state is under no constitutional obligation to provide public education. However, since Temple has decided to sponsor intercollegiate athletics as part of its educational offerings, this program "must be made available to all on equal terms." *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed.2d 873 (1954). Although the mere fact of gender specific teams does not violate the fourteenth amendment, the equal protection clause mandates that Temple's programs may not be operated in a discriminatory fashion. In considering athletic programs courts have repeatedly observed, although none has squarely held, that separate and equal athletic programs are constitutionally permissible. *O'Conner,* 645 F.2d at 581; *Gomes,* 469 F.Supp. at 664; *Hoover,* 430 F.Supp. at 170, *Ritacco v. Norwin School Dist.,* 361

F.Supp. 930 (W.D.Pa.1973). *See also O'Conner,* 545 F.Supp. at 381 n. 7; *Leffel,* 444 F.Supp. at 1121. This circuit has held that the provision of separate and equal high schools for males and females is constitutionally permissible. *Vorchheimer v. School Dist. of Phila.,* 532 F.2d 880 (3d Cir.1976), *aff'd by equally divided court,* 430 U.S. 703, 97 S.Ct. 1671, 51 L.Ed.2d 750 (1977) (per curiam). This court's task is to define the "equality" that is required, and then to determine whether defendants offer equivalent athletic programs to men and women student athletes. *See Hoover,* 430 F.Supp. at 170 (separate teams meet the constitutional requirement of equal opportunity if the teams were given substantially equal support and if they had substantially comparable programs.... "[T]he standard should be one of comparability not absolute equality"); *Leffel,* 444 F.Supp. at 1122 (same). The complaint alleges that Temple's separate programs are unequal in almost every conceivable area, including the allocation of opportunities to compete, expenditures, recruiting, coaching, travel and per diem allowances, uniforms, equipment, supplies, training facilities and services, housing and dining facilities, academic tutoring, and publicity. With a few exceptions, the reams of evidence submitted by plaintiffs and defendants raise genuine issues of material fact with respect to whether class members have been discriminated against in the provision of these resources. I will outline many of these factual disputes below.

A). *Opportunities to compete.*

The gravamen of plaintiffs' complaint is that, despite the fact that Temple's student body is approximately fifty percent female, approximately one-third of the participants in Temple's intercollegiate athletic program are women. Figures produced by defendants in discovery reveal that approximately 450 men and 200 women participate in Tem-

---

**5.** *See* White deposition at 563–65 (women might be able to compete on integrated gymnastics and tennis teams, but no others); affidavit of Eve Atkinson at 5–6 (during the 1985–86 seasons, the best times recorded by female swimmers and runners were generally far slower than the worst times recorded in the same events by male swimmers and runners); affidavit of H. Patrick Swygert. Temple's athletic program operates at the NCAA Division I level, the highest level of intercollegiate competition.

ple's intercollegiate athletic program. *See* Plaintiffs' memorandum, Exhibit C. Temple concedes, *arguendo,* that its decisions as to the selection of teams and the allocation of resources predetermine the participation rates of men and women in intercollegiate athletics. That is, by sponsoring more women's teams and/or fewer men's teams, Temple could increase the participation rate of females in the University's athletic program to 50, 75, or even 100%.

However, defendants claim that plaintiffs have failed to establish that this participation rate is evidence of gender discrimination. Temple argues that the general student population does not constitute a relevant pool. Rather, Temple contends, the relevant pool consists of "those potential students who possess the special abilities and interests to compete in sports at the Division I intercollegiate level." Temple's argument rests upon the proposition that there is no reason to believe that equal numbers of male and female college students possess the exceptional skills and interests required for Division I intercollegiate athletics.

■ Although it is true that "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value," *Hazelwood School Dist. v. United States,* 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977), there exists a genuine issue whether the figures produced by plaintiff evidence a discriminatory impact against women. This is so for at least two reasons. There is evidence that the number of male and female student athletes at Temple who possess the skills and interest required for intercollegiate athletics is not independent of the money

Temple devotes to athletic scholarships and recruiting, and the resources devoted to advertising, promotion and sports information activities. *See* Christine Grant affirmation filed in connection with plaintiffs' motion for preliminary injunction; White deposition at 349. Plaintiffs have introduced evidence from which a fact finder could find that defendants discriminate by gender in the provision of these funds and resources. Second, although the relevant pool must possess special qualifications, the record before me does not establish that the population pool is not a proxy for the distribution of athletic talents and interests. Defendants have submitted the National Federation of High School Association's 1986 Sports Participation Survey, a compilation of data received from all fifty state high school athletic associations regarding the number of high school students who participate in interscholastic sports. This survey [6] reveals that approximately 34% of those who participate in interscholastic sports are girls.[7] As the present record does not reveal the percentage of intercollegiate athletes that participated in interscholastic athletics, I am unable to assess fully the significance of the Sports Participation Survey. Plaintiffs have introduced evidence that some intercollegiate athletes did not compete in interscholastic sports, and that "certain sports found at the college level are often organized for high school aged athletes ... through privately sponsored classes and/or privately sponsored competitions, country clubs, Y's, etc." Plaintiffs' memorandum, Exhibit B. On the record before me, I am unable to appraise fully the significance of this evidence. The present record compels me to conclude that there exists a genuine issue of material fact with respect to the relevant pool.[8] Finally, plaintiffs have pro-

---

**6.** The contents of the survey appear to be admissible under FRE 803(6) or 803(24).

**7.** The figures for the last five years are as follows:

| Year | Number of Boy Participants | Number of Girl Participants |
|------|---------------------------|-----------------------------|
| 1981–82 | 3,409,081 | 1,810,641 |
| 1982–83 | 3,355,558 | 1,779,972 |
| 1983–84 | 3,303,599 | 1,747,346 |
| 1984–85 | 3,354,284 | 1,757,884 |
| 1985–86 | 3,344,275 | 1,807,181 |

**8.** If it appears that the general population is the

duced evidence that talented and interested women student athletes to fill expanded women's teams at Temple "abound," and that Temple could, if it provided the opportunities and devoted the resources, "field an outstanding women's program twice the size of the program it has historically fielded." Plaintiffs' memorandum, Exhibit E. On this record, viewing all inferences to be drawn from the evidence in the light most favorable to plaintiffs, *Continental Ins. Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir. 1982), and resolving all doubts as to the existence of genuine issues of material fact against the defendants, *id.*, I am unable to conclude that defendants are entitled to judgment as a matter of law on this claim.

Defendants argue, at some length, that plaintiffs cannot prove an intent to discriminate against women on this claim because "Temple's program constitutes discrimination *in favor of*, and not against, women." Defendants' motion at 61. Temple argues as follows. If the University sponsored a unisex sports program virtually no women would participate in intercollegiate athletics. Therefore the existence of a separate women's program is a form of preferential treatment. Temple analogizes to a hypothetical case in the racial area:

> Suppose, for example, that Temple had an overall enrollment which was sixteen percent black but, finding that virtually no black students were able to meet the regular admissions standards for the physics program, instituted a special admissions track to increase the number of black students in that program from zero to ten percent. Could *black* applicants then successfully challenge this effort as a violation of the Equal Protection Clause[?].... The plaintiffs are challenging Temple's affirmative efforts in *extending* benefits to women on the theory that Temple has not gone far enough.

This argument misses the mark. In the above example, black students were not precluded from applying to the regular admissions program. The separate track represents an *additional* opportunity to join the physics program. However, the physics program and the men's athletic program are not analogous: both black and white students may apply to the general physics program; only men may try out for the men's sports teams. Thus, the women's teams do not represent an additional opportunity for women to play intercollegiate sports, but rather the *only* opportunity for women to play intercollegiate sports.

■ Here the "intent" that Temple urges does not exist is provided by Temple's explicit classification of intercollegiate athletic teams on the basis of gender. *See Leffel*, 444 F.Supp. at 1121. In this respect, this case is fundamentally different from *Feeney* which defendants repeatedly cite. The state program challenged in *Feeney* granted veterans a lifetime preference for state employment. The Court found that the classification at issue—between veterans and non-veterans—was not gender based, as there were both female veterans and male non-veterans. The fact that the overwhelming majority of veterans were male was not controlling. Here, in contrast, the classification is explicitly gender based. In this regard, the case is similar to *Hogan, supra* (state nursing school explicitly classifies on basis of gender), *Michael M. v. Sonoma County Superior Court*, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981) (state statutory rape statute explicitly classifies on basis of gender) and *Craig, supra* (state statute explicitly classifies on basis of gender).

### B). *Expenditures.*

Plaintiffs claim that the differences in expenditures for the men's and women's intercollegiate athletic programs violate the

---

relevant pool, then perhaps the most probative evidence on plaintiffs' opportunity to compete claim would be testimony from the coaches as to the number of students who tried out and possessed the talent to play at Temple's level of competition but were nevertheless cut. If, for example, one-third of the men talented enough

to compete at Temple's level who try out actually make the men's teams, but one-half of the women talented enough to compete at Temple's level who try out make the women's teams, then it would appear, absent explanation, that plaintiffs' opportunity to compete claim would fail.

equal protection clause.[9] Temple presently spends approximately $2,100 more per male student athlete than per female student athlete.

■ In addition, some evidence suggests that each of the women's teams engages in fund raising, while only the men's crew and baseball teams raise funds. Plaintiffs' memorandum, Exhibits DD at 26–27; EE at 27; GG at 24, 31–2; HH at 19. Other evidence suggests that several men's teams engage in fund raising. *See* White deposition at 125–27; 129–31; 132–33; 148–49. There is conflicting evidence regarding which teams find it necessary to engage in fund raising. A finding that substantially all of the women's teams and few of the men's teams engage in fund raising would support plaintiffs' claim of disparate impact in the area of expenditures.

Defendants argue that there is no gender discrimination because the women student athletes outperform the men student athletes and the "expenditure patterns reflect Temple's policy of operating a unified athletics program while promoting at a higher level its three revenue producing teams."

■ Defendants' first argument is that because the women's teams, collectively, have a higher winning percentage than the men's teams, collectively, and because the women student athletes have a higher mean cumulative grade point average than do the men student athletes, Temple's spending policies do not adversely affect women. Plaintiffs have introduced evidence that it is difficult to compare sensibly the winning percentage of one team with that of another, particularly when looking at different sports. Plaintiffs' memorandum, Exhibit B. Moreover, I do not accept the proposition that teams or programs with comparable win-loss records have necessarily been treated equally in terms of expenditures.[10] Similarly, the fact that women student athletes have a higher mean cumulative grade point average has no relevance to the issue of whether unequal expenditures violate the equal protection clause.[11]

Temple argues, in the alternative, that the difference in per student expenditures is caused solely by the enhanced levels of

---

9. Plaintiffs rely on the following figures in support of this claim:

EXPENDITURES

| Year | Men | Women | Total | Percent of Expenditures Spent on Women |
|------|-----|-------|-------|----------------------------------------|
| 1976–77 | $1,255,198 | $249,463 | $1,504,661 | 16.6 % |
| 1977–78 | 1,223,999 | 272,231 | 1,496,230 | 18 % |
| 1978–79 | 1,368,008 | 381,641 | 1,749,689 | 21.8 % |
| 1979–80 | 1,627,884 | 443,381 | 2,071,264 | 21.4 % |
| 1980–81 | 1,766,073 | 545,906 | 2,311,979 | 23.6 % |
| 1981–82 | 1,785,520 | 578,940 | 2,364,010 | 24.5 % |
| 1982–83 | 2,020,396 | 716,310 | 2,736,706 | 26.2 % |
| 1983–84 | 2,434,666 | 730,996 | 3,165,662 | 23 % |
| 1984–85 | 2,804,739 | 826,472 | 3,631,211 | 22.8 % |
| 1985–86 | 2,277,349 | 592,558 | 2,869,907 | 20.6 % |

Defendants challenge the accuracy of some of these figures. However, the figures defendants produce, *see* Degnan's report, tables 7–10, show the same percentage of funds going to the women's program.

10. Over the last three years, the football team has won 42% of its games, while the women's badminton team won 96% of its matches. Degnan's report, table 14. Last year, Temple spent $1,360,469, or $9514 per student, on the football team, and $9987, or $1248 per student, on the badminton team. I am not, of course, suggesting that the football and badminton teams should receive equal funding. I am suggesting that the relationship between expenditures, win-loss records and equal treatment is not apparent.

11. This is one of many instances in which a party urges me to compare apples and oranges. The numerous and confusing statistical arguments before me constitute a veritible fruit salad. This would be fine if I were hosting a dinner party; it is most unhelpful in trying to apply equal protection law to this case.

support given the football, men's basketball and women's basketball teams. Temple argues that these three "revenue" teams have the potential to provide "unique benefits" to the University, and that it is thus rational to give "enhanced" support to these teams. Temple argues that the remaining twenty-three intercollegiate athletic teams are "nonrevenue" teams. Defendants have introduced evidence that the total expenditures on men's nonrevenue teams are practically identical to the total expenditures on women's nonrevenue teams. Degnan's report, tables 7–10. Moreover, as there are substantially more men than women on the nonrevenue teams, the per student expenditures for the nonrevenue teams favor women. Thus, Temple claims, net expenditures on the men's and women's teams do not constitute gender discrimination.

■ At first blush, Temple's argument is appealing. However, the present record raises material questions regarding defendants' attempt to classify the football and basketball teams as revenue teams, and all other teams as nonrevenue teams. First, the revenue teams produce no net revenue. For example, in 1984–85, the football team had revenues of $514,015, and expenditures of $1,136,152, for a net expenditure of $622,137. In 1985–86, the football team generated $732,738 against expenditures of $1,360,469, for a net expenditure of $627,-731. Degnan's report, tables 8–10. In each of these years the *net* expenditures on this revenue team exceeded the expenditures on the entire women's intercollegiate athletic program. *Id.*, tables 7–10. In each of the last two seasons the purportedly revenue producing men's basketball team had a net expenditure of approximately $200,000. *Id.*, tables 8–10.

The record raises a genuine issue regarding Temple's designation of women's basketball as a revenue sport. At a deposition, Temple's athletic director testified as follows:

Q. So, in your view, the two revenue producing sports at Temple or potentially revenue producing sports at Temple are football and men's basketball?

A. Yes.

Q. And women's basketball, in your view, is not a potentially revenue producing sport at Temple?

A. Not right now, no.

Theokas deposition at 46. *But see id.* at 49–50, 202.

In 1985–86, the women's basketball team produced revenues of $670. Degnan's report, table 9. The women's gymnastics team produced more revenues, *id.*, but apparently is not considered a revenue team. Similarly, in 1984–85, the men's crew team generated $1900 in revenues, but also was not considered a revenue team. Finally, in a 1985 memorandum, Temple's associate director of intercollegiate athletics listed both women's basketball and volley ball as revenue sports. Plaintiffs' memorandum, Exhibit MM. Thus, the record reveals genuine issues of material fact concerning the factual underpinnings of the revenue/nonrevenue distinction.

■ Even assuming that there were no questions of fact regarding Temple's claim that it sponsors three revenue teams, there exist genuine issues of material fact regarding the "unique benefits" these teams provide. Defendants have introduced evidence that football and men's basketball provide enhanced visibility, revenues and publicity beneficial to Temple's enrollment efforts. Temple believes that some day the football and men's basketball teams may be able to generate enough funds to subsidize the entire intercollegiate athletic program. *See* Theokas deposition at 75, 184, 219, 223, 228. The portions of the record cited by defendants do not support the proposition that Temple treats the women's basketball team as if it has the potential to provide special benefits to the University. *Compare* Memorandum of law in support of defendants' motion for summary judgment at 80 *with* Theokas deposition at 76–77. In addition, plaintiffs have produced evidence that revenues are not independent of expenditures on marketing, advertising and promotion, and that various women's teams are capable of generating interest and revenues if the proper investments in

them are made. Plaintiffs' memorandum, Exhibit B.

■ To be sure, Temple has a legitimate interest in obtaining favorable publicity, and in generating revenues through intercollegiate sports. However, these interests, whether individually or in tandem, cannot override the constitutional right to equal protection of the law. In short, there is a genuine factual issue whether the disparate expenditures are substantially related to Temple's interests. Moreover, it is clear that financial concerns alone cannot justify gender discrimination. *See, e.g., Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (proffered justification that gender based military regulation saves money is insufficient to withstand equal protection challenge). However, it is not inappropriate to consider net expenditures when evaluating whether the women's teams are discriminated against in the allocation of funds. *Blair, supra.*

### C). *Recruiting.*

Plaintiffs claim that inequalities in recruiting expenditures constitute gender discrimination. In both 1984–85 and 1985–86, 84% of the funds devoted to recruiting was spent by the men's teams. Degnan's report, table 11. Per capita, defendants spent $236 more on recruiting for men than for women. Siskin's report, table 9A. Plaintiffs have introduced evidence that "[b]ecause recruiting is equally important for men's and women's teams, because the rules governing recruiting are the same, and because recruiting costs are the same for men and women, men's and women's programs should be spending comparable amounts, per capita, on recruiting athletes." Plaintiffs' memorandum, Exhibit B at 9.

Temple claims that it spends sufficient money on recruiting to allow all of its teams to compete at the Division I level, and that the revenue producing teams require greater expenditures for recruiting than do the nonrevenue teams. Excluding the revenue teams, the women's teams receive slightly more recruiting funds per capita than do the men's teams. Degnan's report, tables 7–10.

■ The problems with the distinction between revenue and nonrevenue teams are discussed above. As plaintiffs have produced evidence raising genuine issues of material fact regarding Temple's recruiting expenditures, summary judgment on this claim is inappropriate.

### D). *Coaching.*

Plaintiffs allege that Temple has not and does not provide an adequate number of coaches or assistant coaches for the women's teams,[12] and devotes substantially more resources to the coaching staffs for the men's teams.[13]

Temple argues that, as the women's teams outperform the men's teams, there is no direct correlation between the success of a particular team and the salaries and benefits paid to a team's coaches or the number of coaches assigned to a team.

**12.** Plaintiffs rely on the following figures to support this claim:

HEAD COACHES

| Year | Men Full Time | Men Part Time | Women Full Time | Women Part Time |
|------|---------------|---------------|-----------------|-----------------|
| 1977–78 | 5 | 7 | 0 | 10 |
| 1978–79 | 5 | 7 | 0 | 12 |
| 1979–80 | 5 | 7 | 0 | 10 |
| 1980–81 | 5 | 8 | 0 | 11 |
| 1981–82 | 6 | 8 | 0 | 11 |
| 1982–83 | 6 | 8 | 1 | 10 |
| 1983–84 | 4 | 8 | 2 | 9 |
| 1984–85 | 4 | 8 | 3 | 8 |
| 1985–86 | 4 | 8 | 4 | 8 |

Plaintiffs have also produced evidence that the men's teams have significantly more assistant coaches than do the women's teams. For example, in 1979–80 the men's teams had 11 full time and 8 part time assistant coaches. That year, the women's teams had no full time and 1 part time assistant coach. Defendants contest the accuracy of some of plaintiffs figures. *See* defendants' reply memorandum at 15 n. 17. More precisely, plaintiffs and defendants disagree over whether certain individuals should be considered full time coaches. This dispute cannot be resolved in the context of a summary judgment motion.

**13.** Plaintiffs have produced figures revealing that of all the money spent on head coach salaries, approximately 40% is spent on women's teams, of all the funds spent on assistant coach salaries, approximately 13% is spent on women's teams, and of all the funds spent on coaches salaries, approximately 26% is spent on women's teams.

Temple has produced evidence that seniority and market conditions are factors in determining the salaries paid to athletic coaches. Finally, Temple has produced evidence that, over the last three years, the proportion of women's coaches to total coaches is higher than the proportion of women athletes to total athletes. Degnan's report, table 13.

■ Plaintiff has produced evidence that the quality of coaching cannot be measured by simply evaluating win-loss records, and that compensation is a factor in evaluating the quality of a coaching staff. Plaintiffs' memorandum, Exhibit B. Plaintiffs challenge Degnan's analysis for failing to distinguish between full time and part time coaches. Finally, there is evidence that some of the women's teams receive inferior coaching. *See* plaintiffs' memorandum, Exhibit BB at 9; Exhibit FF at 6. The evidence outlined above precludes a grant of summary judgment on plaintiffs' coaching claim.

### E). *Travel, team trips and accommodations.*

■ Plaintiffs claim that defendants discriminate against women student athletes regarding team travel. In 1985–86, Temple spent $423,908 on team travel for men's teams, and $162,110 on team travel for women's teams. Degnan's report, tables 9–10. In 1984–85, the relevant figures were $349,492 for the men's teams and $145,297 for the women's teams. *Id.*, tables 7–8. The per capita figures also favor the men. *Id.*, tables 7–10. Plaintiffs have produced evidence that when a men's and a women's team travel to the same destination, the men's team receives superior treatment. For example, during the 1984–85 season, the men's and women's basketball teams played at the University of Rhode Island. The men's team flew to their game; the women's team took a bus. *See* plaintiffs' memorandum, Exhibit Z. *See also id.*, Exhibit HH (women's team drives to various locations men's team fly to). There is also evidence that various women's teams must raise funds to travel to certain competitions. Temple argues

that the mode of travel depends on distance, the size of the team and the coach's preference. However, this argument is not supported by the portion of the record defendants cite. *Compare* defendants' memorandum of law at 116 *with* affidavit of Eve Atkinson (docket No. 215).

■ There are also factual disputes over the accommodations defendants offer student athletes on team trips. Defendants claim that Temple's "policy is to house 3 players in a room, 1 to a bed, except for the football and 2 basketball teams." Players on these teams are housed 2 to a room, 1 to a bed. Affidavit of Milton Richards. There is also evidence that "Temple's policy is one student per bed and two students per room" and that some coaches deviate from this policy. Plaintiffs' memorandum, Exhibit AA. Plaintiffs have presented evidence that the women's badminton and softball teams have been housed 4 to a room, *see id.*, Exhibit FF (badminton); Exhibit HH (softball), and that the women's swim team was housed 5 to a room. *Id.*, Exhibit EE. The present record provides conflicting accounts of Temple's policy and is unclear regarding the actual room assignments. *See* attachment to plaintiffs' Exhibit AA (Docket No. 261). Summary judgment cannot be granted on this claim.

Finally, although defendants represent that Temple has sent all student athletes who were invited to post-season competitions, *see* defendants' memorandum at 118, plaintiffs have produced evidence that a female student athlete was invited to compete in a national championship but that there were no funds for this competition. Plaintiffs' memorandum, Exhibit FF. There is also evidence that the women's bowling team had to raise its own funds in order to send the entire team to nationals. *Id.*, Exhibit DD. These disputes over genuine issues of material fact preclude summary judgment on this claim.

### F). *Uniforms, equipment and supplies.*

Plaintiffs allege that defendants provide male athletes with superior support in the areas of uniforms, equipment, including locker rooms, and supplies. In 1985–86,

Temple spent $100,669 on uniforms, equipment and supplies for men's teams, and $33,318 on the women's teams. Degnan's report, tables 9–10. In 1984–85, the figures were $85,491 on men's teams, and $43,735 on the women's teams. *Id.*, tables 7–8. However, as average expenditures vary widely from team to team and year to year,[14] it is difficult to interpret the significance of the figures introduced. However, it seems clear that, assuming male student athletes receive adequate uniforms, equipment and supplies, the female student athletes must likewise receive adequate uniforms, equipment and supplies.

Plaintiffs have introduced evidence that raises genuine issues of material fact on this claim. There is testimony that the women's swim team did not have enough sweat shirts and pants for the entire team. Plaintiffs' memorandum, Exhibit EE. There is evidence that the women's tennis team and the women's badminton team had to share uniforms; sometimes one team would have to wait until the other team was done with the uniforms. *Id.*, Exhibit FF. Plaintiffs have presented testimony that the women's fencing team is provided with inadequate practice uniforms, old and often broken electrical equipment, and an insufficient number of adequate fencing bags and gloves. *Id.*, Exhibit GG. There is evidence that the members of the women's bowling team had to pay for their uniforms. *Id.*, Exhibit DD. There is conflicting evidence regarding the number of locker rooms defendants provide. Summary judgment on this claim is inappropriate.

G). *Facilities and scheduling.*

Plaintiffs allege that defendants have provided and continue to provide superior facilities and scheduling to male student athletes. Plaintiffs claim that the men's teams receive priority in the scheduling of games and practice times.

Defendants present the deposition testimony of associate athletic director Earl Cleghorn, who is responsible for scheduling the use of Temple's facilities for competition and practice by the intercollegiate teams. Cleghorn testified that, in scheduling, competitions take precedence over practices, and "in-season" teams take precedence over "out-of-season" teams. When two teams use the same facility, the times are generally split evenly between the two teams. For example, the men's and women's basketball team use McGonigle Hall for an equal number of hours per week. Similarly, the men's and women's track and field, tennis and gymnastics teams practice at the same time, sharing the same facilities.

The plaintiffs have not pointed to any evidence of record suggesting that female student athletes are discriminated against in the scheduling of practice times.[15]

Plaintiffs also allege that defendants provide more "competitive events for men's intercollegiate athletic teams than they provide for women's intercollegiate athletic teams." Amended complaint at 27. Defendants point to evidence establishing that in 1983–84, 1984–85 and 1985–86, the women's teams participated in more competitive events than did the men's teams. Degnan's report, table 14. Plaintiffs argue that the relevant comparison is between "like sports because the number of competitions varies dramatically by sport." Com-

---

**14.** For example, in 1985–86 the per team averages for the women's teams ranged from $74 for lacrosse to $566 for badminton. For the men in 1985–86, the range was from $43 for wrestling to $811 for basketball. Degnan's report, tables 9, 10. Expenditures for equipment and uniforms went up for the women's bowling team from $76 in 1984–85 to $245 in 1985–86 and down for men's swimming during the same period from $145 to $50. *Id.*, tables 7–10.

**15.** Plaintiffs rely on the fact that the football team practices adjacent to the field hockey team during field hockey competitions, and an expert's statement that "[i]t is highly inappropriate and distracting for one team to practice adjacent to another which is competing" for the proposition that "men and women are treated different in material ways." Plaintiffs' memorandum at 74. It would trivialize the equal protection clause to find that this "distraction" rises to the level of a constitutional violation. Plaintiffs have failed to point to evidence that raises a genuine issue of material fact on this claim.

parison of the like sports does not reveal discrimination against women in basketball, fencing, swimming or gymnastics. Although the men's baseball team plays more games than does the women's softball team, plaintiffs have pointed to no evidence supporting the proposition that, for scheduling purposes, these teams are similarly situated. The only evidence that arguably supports plaintiffs' claim is the showing that the men's tennis team plays more matches than does the women's team. However, the disparity of a handful of tennis matches, in the context of an athletic program that sponsors approximately 400 intercollegiate competitions each year does not raise a genuine issue of material fact on this claim. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (evidence that is "merely colorable" or "not significantly probative" does not preclude summary judgment); *Improvement Co. v. Munson,* 14 Wall. 442, 448, 20 L.Ed. 867 (1872) (mere scintilla of evidence does not raise a question for jury). Therefore, summary judgment will be granted as to plaintiffs' claim of unconstitutional discrimination in the scheduling of athletic events.

### H). *Housing and Dining Services.*

Plaintiffs allege that defendants provide superior housing and dining facilities to male student athletes. As to dining facilities, plaintiffs point to evidence that the men's football team has a training table, but that no women's team has a training table. The uncontradicted record establishes that the head coaches of the men's football team, women's field hockey and the women's volley ball teams select the menu to be served to their players during preseason camp. There is no evidence that any women's team requested, but did not receive, a training table. Plaintiffs have pointed to no evidence that females receive inferior dining services. *Compare* plaintiff's amended complaint at 37–39 *with* plaintiffs' memorandum at 81–82. *See also* plaintiffs' memorandum, Exhibit EE at 24.

■ Temple provides off campus housing for student athletes who practice or compete during school vacation periods. This is called "holiday living." Plaintiffs allege that holiday living expenditures favor male student athletes. Defendants have introduced evidence that the average expenditure for holiday living for the women's teams was higher than the comparable figure for the men's program. Degnan's report, tables 7–10. Plaintiffs point out that Degnan's analysis does not include costs associated with the preseason football training camp, and introduce evidence that other team's preseason expenses are included in their holiday living expenses, and that the training camp expenses are properly considered a part of holiday living expenses. *See* Richards deposition at 70–73, 84. Adding in these figures reveals a higher per capita expenditure on the male student athletes. The factual dispute over the proper figures for the holiday living program cannot be resolved in the context of a summary judgment motion. Summary judgment on the holiday living claim is therefore inappropriate.

### I). *Trainers and Training Services.*

■ Plaintiffs allege that Temple gives preference to male student athletes in the provision of athletic trainers and training services. Plaintiffs have introduced evidence that raises genuine issues of material fact regarding this claim. *See* plaintiffs' memorandum, Exhibit GG at 13–14 (women student athletes arrive before men student athletes, but have to wait for training services until after the men are treated); Exhibit FF at 8–9 (female student athletes not treated until after male student athletes); Exhibit HH at 7 (at times, training room used exclusively for men's teams, women student athletes have to wait for services); Exhibit HH at 16 (women student athletes must take public transportation to get training attention; male student athletes are driven by trainer). Summary judgment will not be granted on this claim.[16]

---

**16.** Defendants argue that "mere anecdotes are insufficient to make out a claim of invidious, class-wide discrimination." Defendants' reply memorandum at 12 n. 12. Defendants rely on

## J). *Tutoring.*

Plaintiffs allege that Temple provides superior academic tutoring support to male student athletes. Defendants have introduced evidence that tutoring services are available, at no charge, to all student athletes. Affidavit of Paul Gibson. Separate study halls are provided to the football and basketball teams. *Id.* In both 1984–85 and 1985–86, women student athletes had a higher mean cumulative grade point average than did the male student athletes, a greater percentage of the female student athletes were making normal academic progress, and, of the seniors in the athletic program, a greater percentage of the women were scheduled to graduate. *Id.*

 Plaintiffs have introduced no evidence that women receive inferior academic tutoring support. *See* plaintiffs' memorandum, Exhibit EE at 17, 25–26; Exhibit FF at 17, 28; Exhibit GG at 23, 31; Exhibit HH at 19, 23. There is no evidence that the academic support provided to the men's teams in study halls is superior to that provided to the women. The mere fact that the men's football team has a separate study hall does not, by itself, suggest discrimination against female student athletes. In the absence of any evidence that women student athletes receive inferior tutoring services, summary judgment on this claim is appropriate.

## K). *Publicity.*

Plaintiffs allege that defendants provide superior publicity to the men's athletic teams. There is evidence that, in 1985–86, defendants spent $189,688 on the football and men's basketball teams, and $0 on the women's teams. Over the last three years, defendants spent $410,672 to publicize the football and men's basketball teams, $1,580 to promote sports generally, and $945 to promote the women's lacrosse team. Plaintiffs' memorandum, Exhibit L. There is evidence that men's teams receive more publicity than do the women's teams. *See id.,* Exhibit EE at 25; Exhibit FF at 16; Exhibit GG at 22, 31; Exhibit HH at 18–19.

 Defendants attempt to justify these spending disparities on the grounds that they "represent an outgrowth of Temple's aim to promote the three revenue producing sports," and that Temple supports the teams with the greatest spectator interest. In the context of the expenditures claim, Temple argued that it treated the women's basketball team as a revenue sport. Since the above figures do not show any expenditures on the women's basketball team, and since there are genuine issues of material fact regarding the revenue/nonrevenue distinction, this rationale cannot support defendants' summary judgment motion. Moreover, as there is evidence that the level of spectator interest is a result of the publicity expenditures Temple makes, this justification cannot support a summary judgment motion. Defendants' motion will be denied as to this claim.

## STATE CONSTITUTIONAL CLAIMS

Neither side has briefed the law applicable to plaintiffs' state constitutional claims. Pennsylvania's Equal Rights Amendment ("ERA") provides that "[e]quality of rights

---

*Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984) and *Croker v. Boeing Company,* 662 F.2d 975 (3d Cir.1981). In *Cooper,* the Court noted that the appellate court distinguished between cases where numerous class members testified, and cases in which few had done so. 467 U.S. at 879 & n. 11, 104 S.Ct. at 2801 & n. 11. *Cooper* does not disapprove of the use of anecdotal evidence, but merely acknowledges that a plaintiff class must present a certain number of examples of individual discrimination before a pattern or practice of discrimination is proved. *Id. Croker* similarly does not disapprove of the use of anecdotal evidence. The court acknowledged that classwide discrimination is often not

established by statistical evidence alone, and recognized that "[o]rdinarily ... plaintiffs will present individual testimony" to bring life to a statistical record. 662 F.2d at 991. In *Croker* the district court properly considered "illustrative individual testimony," *id.* at 997, but did not err in concluding that plaintiffs did not prove a pattern or practice of discrimination for purposes of Title VII. The "anecdotes" introduced by plaintiffs do not merely recount instances of individual mistreatment, but rather present a picture of men, as a class, receiving preferential treatment. In the context of a Rule 56 motion, I cannot conclude that defendants are entitled, as a matter of law, to judgment on this claim.

under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual." Defendants argue that the ERA "is coextensive" with the Federal Equal Protection Clause. Defendants cite one case, *Fischer v. Pennsylvania Department of Public Welfare*, 509 Pa. 293, 502 A.2d 114 (1985), to support this proposition. A careful reading of *Fischer* leads me to reject the proposition that the state ERA and Federal Equal Protection Clause are necessarily coextensive.

*Fischer* involved a variety of state constitutional challenges to a state statute restricting the public funding of abortions. Plaintiff first challenged the statute under Article I § 1 and Article III § 32 of the Pennsylvania Constitution, provisions which "have generally been considered to guarantee the citizens of this Commonwealth equal protection under the law." 509 Pa. at 304–05, 502 A.2d at 120. The court explicitly adopted an "equal protection analysis," and specifically rejected appellant's invitation to apply "a different analysis here than that applied to the federal equal protection claim in *Harris [v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) ]." *Id.* at 305, 502 A.2d at 120. The court characterized the right at issue as "the purported right to have the state subsidize the individual exercise of a constitutionally protected right, when it chooses to subsidize alternative constitutional rights." *Id.* at 307, 502 A.2d at 121. Applying a rational relation test, *Fischer* held that the challenged statute was not a denial of equal protection.

In another section of the opinion, the court considered petitioner's ERA challenge. The Pennsylvania Supreme Court noted that it had repeatedly employed the ERA to "protect[ ] the rights of women and men to be treated without reliance upon their sexual identity. In doing so we have recognized that distinctions which 'rely on and perpetuate stereotypes' as to the responsibilities and capabilities of men and women are anathema to the principles of the E.R.A." *Id.* at 313, 502 A.2d at 125 (citation omitted).

The court reasoned that the challenged statute did not violate the ERA because it did "not accord varying benefits to men and women because of their sex, but accords varying benefits to one class of women, as distinct from another, based on a voluntary choice made by the women." *Id.* at 314, 502 A.2d at 125. The statute was therefore "in no way analogous to those situations where the [classification is] 'based exclusively on the circumstances of sex, social stereotypes connected with gender, [or] culturally induced dissimilarities.' " *Id.* at 315, 502 A.2d at 126 (citation omitted).

If the ERA was "coextensive with the Equal Protection Clause," as defendants argue, then there would be no need for the Pennsylvania Supreme Court to have undertaken a lengthy equal protection analysis, and then a separate and detailed ERA analysis. The court's ERA analysis, unlike its equal protection analysis, does not track the analysis used for federal equal protection claims, and does not cite any federal equal protection cases. Although this statute survived both an equal protection and an ERA challenge, *Fischer* does not support defendants' argument.

My conclusion that the ERA and Equal Protection Clause are not necessarily coextensive is buttressed by *Commonwealth, Packel v. Pennsylvania Interscholastic Athletic Ass'n*, 18 Pa.Cmwlth. 45, 334 A.2d 839 (1975). This action involved a challenge, under the state ERA and the fourteenth amendment's Equal Protection Clause, to a state athletic association bylaw which provided that "girls shall not compete or practice against boys in any athletic contest." The court found this provision "unconstitutional *on its face* under the ERA.... We need not, therefore, consider whether or not the [bylaw] also violates the Fourteenth Amendment to the United States Constitution." *Id.* at 49, 334 A.2d at 841 (emphasis added).

I note that *Packel* rejected certain arguments similar to those that defendants raise in the instant case:

[Defendant] seeks to justify the challenged [bylaw] on the basis that men

generally possess a higher degree of athletic ability in the traditional sports offered by most schools and that because of this, girls are given greater opportunities for participation if they compete exclusively with members of their own sex. This attempted justification can obviously have no validity with respect to those sports for which only one team exists in a school and that team's membership is limited exclusively to boys. Presently a girl who wants to compete interscholastically in that sport is given absolutely no opportunity to do so under the challenged [bylaw]. Although she might be sufficiently skilled to earn a position on the team, she is presently denied that position solely because of her sex. Moreover, even where separate teams are offered for boys and girls in the same sport, the most talented girls still may be denied the right to play at that level of competition which their ability might otherwise permit them. For a girl in that position, who has been relegated to the "girl's team", solely because of her sex, "equality under the law" has been denied.

*Id.* at 52, 334 A.2d at 842.

Another recent case sheds light on plaintiffs' state constitutional claims. In *Newberg v. Board of Public Education,* 26 Pa.D. & C.3d 682 (C.P.Phila.1983), female class members challenged defendants' policy of excluding females from Central High School. After making extensive findings of fact, the court concluded that the all female high school and the all male high school were "materially unequal," particularly in the educational opportunities provided.[17] Applying a substantial relationship test, the court found that the policy of excluding girls from Central High violated the fourteenth amendment's equal protection clause. Applying a more rigorous strict scrutiny test, the court found that defendants' policy violated the ERA. The court, citing *Packel,* concluded that "under Pennsylvania's ERA, the separate-but-equal concept under the equal protection

clause of the Fourteenth Amendment ... does not have currency." *Id.* at 709.

I recognize that neither *Packel* nor *Newburg* present controlling interpretations of state law. The Pennsylvania Supreme Court has not yet clarified the precise standard to be employed when considering ERA challenges to state action. Certain cases suggest an absolutist or literal approach to the ERA: "sex ... is no longer a permissible factor in the determination of ... legal rights and responsibilities." *Henderson v. Henderson,* 458 Pa. 97, 101, 327 A.2d 60, 62 (1974). Other cases suggest that a less than absolutist position is proper. *See, e.g., Fischer,* 509 Pa. at 314, 502 A.2d at 125 (observing, in dicta, that sister states with ERAs permit differential treatment reasonably and genuinely based on physical characteristics unique to one sex).

■ In any event, it is clear that judicial scrutiny of programs challenged under the ERA is at least as searching as that employed in an equal protection analysis. I will not grant summary judgment on plaintiffs' state constitutional claims where I did not grant summary judgment on plaintiffs' federal constitutional claims. However, as there is no evidence of unequal treatment in the academic tutoring program, scheduling of athletic competitions, and provision of dining facilities, summary judgment on these claims is appropriate.

### Title IX Claims

Plaintiffs allege that Temple's distribution of athletic scholarships violates Title IX. Defendants argue that summary judgment should be entered on this claim because Title IX does not apply to the athletic scholarships at issue. In the alternative, defendants argue that women student athletes receive a proportionate share of financial aid. Finally, defendants argue that Title IX forbids only intentional discrimination, and that there is no evidence of an

---

**17.** This finding conflicts with that made in *Vorchheimer.* The *Vorchheimer* court relied upon the conclusion that, in general, the edu-

cation available to females at Girls High was comparable to that available to males at Central High. *See* 532 F.2d at 882.

intent to discriminate. I shall consider each argument seriatim.

Defendants rely on *Bennett v. West Texas State University,* 799 F.2d 155 (5th Cir. 1986) for their argument that Title IX does not cover athletic scholarships. In *Bennett,* a class of female student athletes alleged that the defendant university ("WSTU") discriminated on the basis of gender in its athletic program. The court found that, although the financial aid program received federal financial aid, *id.* at 157, the athletic program was not a recipient of federal funds, and therefore not subject to Title IX. *Id.* at 158. On appeal, plaintiffs argued that since the financial aid office had partial responsibility for the administration of athletic scholarships, the athletic scholarships themselves must be administered in a nondiscriminatory manner. The apparently uncontradicted record revealed that WSTU's financial aid office plays no role in determining who receives athletic scholarships or how much each student receives. The athletic department has sole responsibility for these decisions. The financial aid office reviews the award of athletic scholarships only to be certain that the total amount of funding given to any particular student does not exceed the maximum permitted by federal or NCAA regulations. If the total aid exceeds the maximum allowed, the amount of athletic scholarship aid is reduced. On these facts, the fifth circuit concluded that "there is merely a ministerial relationship between the[se] two programs, insufficient to bring athletic scholarships under Title IX coverage." *Id.* at 159.

Temple presents evidence that its financial aid program is administered in precisely the same way as the program at WSTU, and urges me to adopt the analysis and conclusion of the *Bennett* court. However, with all due respect, I find that *Bennett*'s overly parsimonious definition of "program" is not supported by *Grove City.* The *Bennett* court's conclusion that athletic scholarships are not part of WSTU's financial aid program is based on the factual finding that there is "merely a ministerial relationship between the two programs." The court thus focused on the

administrative relationship between the granting of athletic aid and the granting of other types of financial aid. The Supreme Court has specifically rejected this type of analysis: "[The University's] choice of administrative mechanisms, we hold, neither expands nor contracts the breath of the 'program or activity'—the financial aid program—that receives federal assistance and that may be regulated under Title IX." *Grove City,* 465 U.S. at 572, 104 S.Ct. at 1221. The proper focus is on the "purpose and effect" of the federal financial assistance. *Id.* 573–74, 104 S.Ct. at 1221. *See also id.,* 599–600, 104 S.Ct. at 1234–35 (Brennan, J., concurring in part and dissenting in part); *O'Conner v. Peru State College,* 781 F.2d 632, 641 (8th Cir.1986). In *Grove City,* the University received Basic Educational Opportunity Grants ("BEOGs"). The Court rejected the argument that only the administration of these funds was covered by Title IX. *Id.* at 571 n. 21, 104 S.Ct. at 1220 n. 21. Rather, these grants brought the entire financial aid program within the ambit of Title IX. BEOGs clearly augment the resources that the College itself devotes to financial aid, *id.* at 571–72, 104 S.Ct. at 1220, and "enable [the College] to offer [its] services to students who had previously been unable to afford higher education." *Id.* at 573, 104 S.Ct. at 1221. As BEOGs "represent federal financial assistance to the College's own financial aid program ... it is that program that may properly be regulated under Title IX." *Id.*

◼ *Grove City* thus cannot be read to support the artificial subdivision of the financial aid program *Bennett* accepted and Temple now urges. As other courts have recognized, *Grove City* "expressly rejected the argument that Title IX forbids discrimination only in the administration of the *federal* financial aid funds and not in the administration of the *entire* financial aid program." *O'Conner,* 781 F.2d at 641. *Grove City* supports the common sense proposition that there are different types of financial aid that a student may receive. If, for example, Temple received federal financial assistance for work study and

grants, but not for loans, surely loans would not therefore be excluded from Temple's financial aid program. Similarly, athletic scholarships are a part of the University's financial aid program, and are within the ambit of Title IX. This conclusion is supported by Title IX's implementing regulations, which identifies athletic scholarships as a form of financial assistance. *See* 34 C.F.R. § 106.37.

Plaintiffs allege that, on both an aggregate and a per capita basis, women student athletes receive less athletic financial aid than do male student athletes.[18] Plaintiffs' expert summarizes the relevant data as follows: Each year "female student athletes received a smaller percentage of athletic aid than was represented by their percentage rate of athletic participation. This history is highly statistically significant. That is to say, the likelihood of this happening by chance is virtually nonexistent." Plaintiffs' memorandum, Exhibit A.

In support of their argument that women student athletes receive their proportionate share of financial aid, defendants introduced evidence that, during the last three years, women student athletes have received approximately 30% of the total financial aid, athletic grants and total grants awarded to Temple student athletes, and that women constitute approximately 30% of Temple student athletes.

Title IX's implementing regulation, 34 C.F.R. § 106.37(C), provides as follows:

Athletic Scholarships. (1) To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in … intercollegiate athletics.

Temple argues that summary judgment is appropriate upon consideration of the figures from the last three years, and urges the court to disregard figures from earlier years. Temple points out that on July 1, 1982, defendant Liacouras became the new president of Temple University, and the separate men's and women's programs were merged into a common administrative unit. Temple argues that "[t]hese changes rendered irrelevant any evidence of discrimination by the predecessor administration as a matter of law." I disagree.

■ In *Mayor City of Phila. v. Educational Equity League*, 415 U.S. 605, 613, 94 S.Ct. 1323, 1329, 39 L.Ed.2d 630 (1974) the Supreme Court held that it was error to order "prospective injunctive relief against the new Mayor in a case devoted exclusively to the personal appointment policies of his predecessor." The Court stated that the issuance of prospective relief against a successor in office must rest on factual findings that the new officer will continue the practices of his predecessor. *Id.* at 622, 94 S.Ct. at 1334. This case does not involve a "discretionary appointment power[ ]," *id.* at 614, 94 S.Ct. at 1330; but rather a set of institutional practices. As Temple concedes that it continues to sponsor separate teams for men and women, the fact that the teams were merged for administrative purposes is irrelevant. Temple's concession, and plaintiffs' exhib-

---

**18.** Plaintiffs rely on the following figures to support this claim:

ATHLETIC SCHOLARSHIP EXPENDITURES

| Year | Men | Women | Total | Percent Women |
|------|-----|-------|-------|---------------|
| 1975–76 | $ 757,889 | $ 33,655 | $ 791,544 | 4 % |
| 1976–77 | 697,093 | 57,174 | 754,267 | 8 |
| 1977–78 | 674,413 | 102,195 | 776,608 | 13 |
| 1978–79 | 735,198 | 151,690 | 886,888 | 17 |
| 1979–80 | 831,499 | 189,612 | 1,021,111 | 19 |
| 1980–81 | 967,578 | 248,787 | 1,216,365 | 20 |
| 1981–82 | 1,113,736 | 286,929 | 1,400,665 | 20 |
| 1982–83 | 1,293,273 | 349,790 | 1,643,063 | 21 |
| 1983–84 | 1,256,276 | 452,793 | 1,709,069 | 26 |
| 1984–85 | 1,376,035 | 496,195 | 1,872,229 | 27.5 |
| 1985–86 | 1,507,494 | 603,960 | 2,111,454 | 28.6 |

its, would support a finding that the present administration has continued the allegedly discriminatory practices of its predecessor.

*Bazemore v. Friday*, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), supports my conclusion. In *Bazemore*, plaintiffs alleged race discrimination in a state program. The program had been racially segregated until 1965. Although the suit was filed in 1971, and certain statutory claims did not arise until 1972, the court properly considered statistics from the pre–1965 era, to determine if the present conditions were a "mere continuation" of the earlier conditions. 478 U.S. at —— n. 6, 106 S.Ct. at 3007 n. 6.

Moreover, even if the pre–1982 figures have "no present legal consequences," they "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). *Cf. McCleskey v. Kemp*, —— U.S. ——, —— n. 20, 107 S.Ct. 1756, 1770 n. 20, 95 L.Ed.2d 262 (1987) (rejecting petitioner's attempt to rely on Civil War era laws as historical evidence of discriminatory intent, and noting that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value.")

■ Even if the only relevant figures were those for the last three years, summary judgment would be inappropriate. There is a genuine issue of material fact over whether Temple unconstitutionally limits women's participation rates in intercollegiate athletics. If the participation figures result from unlawful discrimination, then they cannot justify summary judgment on plaintiff's Title IX claim.[19]

Finally, Temple argues that plaintiffs must prove discriminatory intent to succeed on their Title IX claim. Neither the Supreme Court nor the third circuit has decided whether intent is a necessary element of a Title IX claim. However, recognizing that "Title IX was patterned after Title VI of the Civil Rights Act of 1964," *Grove City*, 465 U.S. at 566, 104 S.Ct. at 1218, defendants urge me to adopt the intent standard adopted for Title VI actions in *Guardians Ass'n v. Civil Service Commission*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983).

■ In *Guardians*, the "threshold issue before the court [was] whether ... private plaintiffs need to prove discriminatory intent to establish a violation of Title VI ... and administrative implementing regulations promulgated thereunder." *Id.* at 584, 103 S.Ct. at 2323. A majority of the Court agreed that a violation of the statute itself requires proof of discriminatory intent. However, a different majority agreed that proof of discriminatory effect suffices to establish liability when suit is brought to enforce the regulations rather than the statute itself. *See id.* at 607 n. 27, 103 S.Ct. at 3235 n. 27 (opinion of White, J.); *id.* at 608 n. 1, 103 S.Ct. at 3235 n. 1 (opinion of Powell, J., concurring). *See also Alexander v. Choate*, 469 U.S. 287, 293, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985); *Latinos Unidos de Chelsea v. Secretary of Housing*, 799 F.2d 774, 785 n. 20 (1st Cir.1986); *Larry P. by Lucille P. v. Riles*, 793 F.2d 969, 981–82 (9th Cir.1984). Plaintiffs' complaint explicitly alleges violations of both Title IX and the implementing regulations. *See* amended complaint at 4, 45–47. The Title IX regulations, like the Title VI regulations at issue in *Guardians*, do not explicitly impose an intent requirement. As there is no reason that a Title IX plaintiff should have a higher burden of proof than a Title VI plaintiff, *see, e.g., Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (interpretation of Title IX dependent upon interpretation of Title VI); *Chowdhury v. Reading Hospital & Medical Center*, 677 F.2d 317 (3d Cir.1982), *cert. denied*, 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1411 (1983) (courts have "consistently held" language of Title IX cases applicable to Title

---

**19.** It is thus unnecessary for me to address defendants' arguments that the Title IX analysis must focus on total aid, and must account for the difference between in-state and out-of-state tuition rates.

VI cases), I hold that plaintiffs need not prove discriminatory intent to succeed on their claim.

�no▮ Plaintiffs have also alleged that Temple discriminates in the allocation of book loans, an aspect of financial aid. In recent years, approximately one-third of the student athletes receiving book awards have been women. Moreover, women did not receive such awards before the 1981–82 school year. Temple has introduced evidence that the Association for Intercollegiate Athletics for Women ("AIAW"), the body that regulated Temple's women's sports teams, "prohibited the award of a book loan" to women student athletes. Affidavit of Eve Atkinson at 2. Plaintiffs have introduced evidence that AIAW rules explicitly permitted book loans to women. Plaintiff's memorandum, Exhibit B (affirmation of AIAW past president). Summary judgment is inappropriate on this claim.

*Plaintiff's Motion to Exclude Evidence*

Plaintiffs move to strike the expert reports of Drs. Degnan and Siskin. Both reports include statistical analyses of financial aid, expenditure and revenue data, coach assignments, and the competitive performance of the various Temple teams. Plaintiffs argue that these reports should be precluded because they were produced after the discovery deadline, and because their analyses were based on data different from that provided by defendants during discovery.

▮▮ It is not contested that the reports were produced shortly after the discovery deadline. Discovery in this case lasted over six years. The progress of this case has been interrupted repeatedly—*Grove City* changed the applicable law, there have been other summary judgment motions and appeals, and, since last fall, the parties have been occupied with collateral matters. The discovery deadline has been extended repeatedly. Plaintiffs will have had these reports for months before trial. I will not strike the reports on the grounds that they were untimely produced.

The fact that the reports utilized figures other than those provided in discovery

presents a more troubling issue. It appears that Temple maintains computerized budget and expenditure records called "cost center reports." For accounting purposes, these reports go through four separate "closes" called the "first close," "second close," etc. The reports are based on the "third close" cost center reports.

On August 2, 1985, Temple's counsel wrote to plaintiffs' counsel that "probably the best source of information concerning annual expenditures ... is the end-of-the-year cost center reports that are completed following the second close in July of each year." In response to an interrogatory asking which "close" is used in preparing budget entries, defendants stated "[w]hichever is most current as of the time the budget is prepared for presentation to the Board of Trustees. That is generally the second close." The assistant vice president and budget director testified that the University budget is based on the second close, and that "the second close is what is distributed to the University departments. Generally, the third and fourth closes are accounting transactions." Orr deposition at 161. Plaintiffs state that as a result of the information they received, they conducted discovery based on the second close figures.

There are a number of differences between figures produced in discovery and those included in the expert reports. For example, in response to an interrogatory, defendants stated that 441 men and 208 women participated in intercollegiate sports during the 1984–85 term. Degnan's report shows 417 men and 204 women participants during that year. There are also differences in team expenditures and the numbers of coaches in various sports.

Defendants claim that some of the differences in data represent corrections of errors found in the original discovery responses, and argue that the differences between the two sets of figures are minimal. For example, the interrogatory answer referred to above shows that women constituted 32.0% of all student athletes in 1984–85, while Degnan's report produces a

32.8% figure. Similarly, of the 278 independent expenditure entries covering the 1984–85 and 1985–86 terms, the difference between the second and third closes exceeds $1 in only ten of these entries. The second and third close figures concerning athletic scholarships are identical.for 1983 and 1984. None of the differences in figures is material in the context of the present motion.

■ Finally, it does not appear that plaintiffs are prejudiced by defendants' use of the third center closes. First, defendants' motion for summary judgment was largely unsuccessful. Second, many of the figures in the reports are identical to those produced in discovery, and many others differ by marginal amounts. Third, plaintiffs will have had these reports for months before trial. Fourth, plaintiffs may argue at trial that the second close figures are more accurate and reliable. Finally, it may be that the reports, which cover only the last three years, will be of limited relevance at trial. In the absence of a strong showing of prejudice to plaintiffs, I will not adopt the drastic sanction of striking these reports.

Plaintiffs have also argued that much of the evidence submitted in support of defendants' summary judgment motion is not properly before the court. However, none of the challenged evidence resulted in the entry of summary judgment against plaintiffs. Summary judgment will be granted on the scheduling and number of competitions, dining facilities and academic tutoring claims. Judgment on these claims is appropriate because plaintiffs failed to introduce evidence raising a genuine issue of material fact on these claims. Therefore, it is not necessary to address plaintiffs' evidentiary arguments.

MEMORANDUM

ON MOTION FOR RECONSIDERATION

Plaintiffs move for reconsideration of my October 30, 1987 order. For the reasons that follow, plaintiffs' motion will be granted, and the order will be amended.

After a careful and thorough review of the evidence submitted in support of and in opposition to defendants' motion for summary judgment, I determined that plaintiffs had failed to produce probative evidence of unlawful gender discrimination in the dining facilities and academic tutoring programs offered to Temple student athletes and in the scheduling of intercollegiate athletic competitions. I further found that there were genuine issues of material fact regarding plaintiffs' allegations of unlawful gender discrimination in numerous other areas of defendants' intercollegiate athletic program. The October 30th order entered judgment in favor of defendants "on plaintiffs' claims of unlawful discrimination in dining facilities, academic tutoring and the facilities and scheduling claims." In all other respects, defendants' motion for summary judgment was denied.

Plaintiffs argue that it was error to enter judgment on these matters because "they are not separate claims, but portions of a single claim." Plaintiffs' argument highlights a tension between Rule 56 and Rule 54. Rule 56(b) provides that "[a] party against whom a claim ... is asserted ... may move ... for a summary judgment in the party's favor as to all *or any part thereof.*" Fed.R.Civ.P. 56(b) (emphasis added). However, although Rule 56 appears to authorize a party to move for summary judgment as to a portion of a claim, Rule 54 permits the entry of judgment only "as to one or more" of the claims at issue. Fed.R.Civ.P. 54(b). That is, Rule 56 "does not contemplate a summary judgment for a portion of a single claim in suit. Neither does any other rule in the Rules of Civil Procedure.... A partial summary judgment, as the instant one is termed, under the circumstances before us is a misnomer." *Coffman v. Federal Laboratories,* 171 F.2d 94, 98 (3d Cir.1948), *cert. denied,* 336 U.S. 913, 69 S.Ct. 603, 93 L.Ed. 1076 (1949) (quoting *Biggins v. Oltmer Iron Works,* 154 F.2d 214, 216 (7th Cir.1946)). To the extent that Rule 56 authorizes consideration and summary disposition of less than an entire claim, "[a] more accurate description of the court's action in such a situation is that it has

rendered an interlocutory summary adjudication." 6 J. Moore, *Moore's Federal Practice* ¶ 56.20[3.–1] at 56–1214 (collecting cases). Such adjudications are, generally, not appealable. *Id.*

Thus, the question presented is whether the allegations of discrimination in academic tutoring, dining facilities and the scheduling of athletic events constitute separate claims, making appropriate the entry of judgment, or are portions of a larger claim.

There is no definitive test to determine whether more than one claim is before the court. In *Sears, Roebuck & Co v. Mackey,* 351 U.S. 427, 436, 76 S.Ct. 895, 900, 100 L.Ed. 1297 (1956), the Supreme Court spoke in terms of claims that were "inherently inseparable from," "closely related to," or "sufficiently independent of" those in other counts. This is not a particularly precise standard. In *RePass v. Vreeland,* 357 F.2d 801, 805 (3d Cir. 1966), we noted the "difficulty of providing simple criteria to resolve this onerous problem." In that case we held that preclusion of recovery on one item of damages under a claim of negligence did not constitute [an adjudication of a separate claim and therefore] a certifiable order.

*Allegheny County Sanitary Authority v. U.S.E.P.A.,* 732 F.2d 1167, 1172 (3d Cir. 1984).

*Liberty Mutual Ins. Co. v. Wetzel,* 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976) is instructive. In *Wetzel,* the Supreme Court reviewed a complaint alleging that an employer's "employee insurance benefits and maternity leave regulations discriminated against women in violation of Title VII." *Id.* at 739, 96 S.Ct. at 1204. The Court concluded that this complaint "set forth but a single claim," *id.* at 743, 96 S.Ct. at 1206, for purposes of Rule 54(b). Although the Court did not "attempt any definitive resolution of the meaning of what constitutes a claim for relief within the meaning of the Rules," *id.* at 743 n. 4, 96 S.Ct. at 1206 n. 4, it stated that "a complaint asserting only one legal right, even if seeking multiple remedies for the alleged violation of that right, states a single claim for relief." *Id.*

Thus, although precedent provides only hazy guidelines, resolution of the instant matter is not difficult. Notwithstanding their present arguments, defendants have recognized that the allegations of discrimination in each different aspect of Temple's intercollegiate athletic program do not constitute separate claims. In the memorandum in support of defendants' motion for summary judgment (Docket No. 214), defendants state that plaintiffs' amended complaint sets forth a "financial aid claim ... rooted in Title IX," as well as "two [other] claims ... based on the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution and the Pennsylvania Equal Rights Amendment." Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 2. This memorandum then discusses the "financial aid claim," *id.* at 3–45, the "opportunities to compete claim," *id.* at 46–66, and the "expenditures claim." *Id.* at 67–124. Plaintiffs argue that the amended complaint presents a Title IX claim, a federal constitutional claim, and a state constitutional claim. At this point, it is not necessary to characterize plaintiffs' claims. However, it is clear that the allegations of discrimination in the tutoring program, dining facilities and the scheduling and number of competitions do not constitute separate claims for purposes of entering final judgment. *Compare Wetzel, supra,* and *RePass, supra* (in negligence action against attorneys, prayer for damages for (1) the loss of a cause of action because a complaint was not timely filed and (2) monies extended to prosecute a worthless cause of action are parts of "a single claim") with *Sears, supra* (count alleging wilful destruction of "Metalcraft" business is "clearly independent" of count alleging unlawful inducement of breach of "Vascoloy" commission contract and count alleging unlawful destruction of "Time Saver's business by unfair competition and patent infringement"). For this reason, final judgment should not have been entered

on these issues. An appropriate order follows.