Jennifer Baldwin **COOK**, Melissa Ehlers, Christine Price Thayer Jaques, Julie Wolff and Michael Fitzgerald, Plaintiffs,

v.

**COLGATE UNIVERSITY,** Defendant.

**No. 90-CV-411.**

United States District Court, N.D. New York.

Sept. 28, 1992.

Seidenberg, Strunk & Goldenberg (Faith A. Seidenberg, Bonnie Strunk, of counsel), Syracuse, N.Y., for plaintiffs.

Evans, Severn, Bankert & Peet (Robert J. Lutz, of counsel), Utica, N.Y., for defendant.

## MEMORANDUM–DECISION AND ORDER

HURD, United States Magistrate Judge.

### I. Introduction.

The plaintiffs are all female (Michael Fitzgerald, student coach of the women's club ice hockey team, withdrew from this action), and former students at the defendant Colgate University ("Colgate"), located in Hamilton, New York. They are also former members of the Colgate women's club ice hockey team.

The complaint was filed on April 10, 1990, and Colgate filed an answer on June 18, 1990. In the complaint, the plaintiffs allege that Colgate's 1988 decision to maintain women's ice hockey as a club sport, violated Title IX, 20 U.S.C. § 1681 *et seq.*, as amended by the Civil Rights Restoration Act of 1987, the regulations of the Department of Education, 34 C.F.R. Chapter 1, subpart D, § 106.1 and § 106.41, and the Fifth and Fourteenth Amendments of the United States Constitution. Colgate denied the material allegations in the complaint.

The court conducted a three day nonjury trial on March 31, April 1 and 2, 1992, in Utica, New York. The parties filed post-trial proposed findings of fact and conclusions of law. This Memorandum–Decision and Order constitutes the court's findings of fact and conclusions of law.

### II. Background.

Until 1970, Colgate was an all male school. In that year, women students were admitted for the first time. Enrollment of women has increased steadily until the present day, when it is almost fifty per cent (50%). In 1990/91, the total enrollment was 2,690, with 1,450 men (53%), and 1,240 women (47%).

Colgate has had a strong competitive men's varsity ice hockey team for many years. Together with men's football and men's basketball, it is an "emphasized" sport, which means it receives additional financial aid and other support. In 1990, women's basketball also became an "emphasized" sport. The men's varsity ice hockey team is a member of the Eastern Collegiate Athletic Conference (ECAC) and competes in the National Collegiate Athletic Association (NCAA) tournament. It has always been a leading team in the Conference, and has challenged for the Division I NCAA championship in recent years.

Women's ice hockey at Colgate has had no such tradition or illustrious past. However, a club team was formed shortly after women were first admitted, and the team has been competitive in the club league since that time.

In addition to its twenty-three varsity teams, Colgate also sponsors between eighteen to twenty club teams. Club teams are somewhat informal, principally run by students, and range from ultimate frisbee to rugby. It is obvious that a varsity team has much greater status, both within and without the university community, than a club team. A varsity team is an "official" representative of the university with full-time coaches, designated schedules, rules, and regulations. A varsity team is provided equipment, practice facilities, and travel accommodations. A club team is much more "unofficial", with more informal schedules, practices, and competition. Its equipment, facilities, and travel are of a more "make shift" nature.

In 1979, 1983, 1986, and 1988, the women's club ice hockey team applied for varsity status. In order for a sport to attain varsity status at Colgate, an application must be made to the Committee on Athletics which consists of faculty and student members, with the Director of Athletics as a nonvoting advisory member. If an application for varsity status is approved by the committee, and with the consent of both the Director of Athletics and the Dean of the Facility, the proposal is then presented to the President for final approval. If an application is rejected by the committee, the applicants may reapply in two years.

The women's ice hockey applications were rejected in all four years. In 1988, members of the women's ice hockey team presented a detailed twenty-nine page proposal. *Plaintiffs' Exhibit "15"*. On November 7, 1988, plaintiff Cook, with two other hockey players, made an oral presentation to the committee, followed by some questions and answers. After a discussion by the committee, a vote was postponed until the next meeting. On November 14, 1988, the committee unanimously voted to deny the application and elected to maintain women's ice hockey as a club rather than a varsity sport. The plaintiffs were notified in writing regarding the committee's decision. *Plaintiffs' Exhibit "4"*. The committee gave the same four reasons for the rejection as it had given in both 1983 and 1986:

(1) Women's ice hockey is rarely played on the secondary level;

(2) Championships are not sponsored by the NCAA at any intercollegiate level;

(3) The game is only played at approximately fifteen colleges in the east; and

(4) Hockey is expensive to fund, and would heavily impact a total intercollegiate program by requiring: increased locker room space, large budget, a full-time coach, a trainer, increased training room load, increased equipment room size, heavy laundry demand, and coach supported financial aid.

*Plaintiffs' Exhibit "3"*. At trial, Colgate advanced two additional reasons, to wit, a lack of general student interest in women's ice hockey, and a lack of ability by the members of the women's club ice hockey team. This action was commenced by the plaintiffs as a result of that 1988 decision, seeking elevation to varsity status, compensatory damages, and attorneys' fees.

III. Legal Standards.

Title IX of the Education Amendments of 1972, Pub.L. 92–318, as amended, 20 U.S.C. § 1681, *et seq.*, prohibits gender discrimination in education programs or activities receiving federal financial assistance. *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 514, 102 S.Ct. 1912, 1914, 72 L.Ed.2d 299 (1982). At issue here is Title IX's "program specific" prohibition of gender discrimination which states in part:

**Prohibition against discrimination;**

No person in the United States shall, on the basis of sex, be excluded from participation, in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance,....

20 U.S.C. § 1681(a).

Colgate is an educational institution receiving Federal financial assistance, and

thus its athletic department is subject to Title IX.[1] The plaintiffs, as women whose past athletic opportunities have been restricted, are entitled to the protection of Title IX.

In addition to the text of Title IX, the Department of Education has promulgated regulations governing the administration of programs that receive federal funding. The regulations applicable to this case are found at 34 Code of Federal Regulations § 106.41 *et seq.* as follows:

§ 106.41 Athletics.

(a) *General.* No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

(b) *Separate teams.* Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

(c) *Equal opportunity.* A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities

are available the Director will consider, among other factors:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

Plaintiffs contend that Colgate's refusal to upgrade the women's club ice hockey team violated Title IX and the Fifth and Fourteenth Amendments. Initially, Title IX and the implementing regulations can be violated without showing a specific intent on the part of the educational institution to discriminate against women. *Haffer v. Temple University of Commonwealth System of Higher Education,* 678 F.Supp. 517, 539 (E.D.Pa.1987). However, in order to establish a violation of the Fourteenth Amendment in a gender discrimination case, intentional acts must be demonstrated. *See Cf. Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597

---

1. Although no evidence was introduced to support or refute this conclusion, the parties did not dispute the contention that Colgate and its athletic department are subject to the provisions of Title IX. *See* 20 U.S.C. § 1687(2)(A).

(1976); *Croteau v. Fair*, 686 F.Supp. 552, 553 (E.D.Va.1988).

■ As a preliminary matter, it has been urged by Colgate that this action should immediately fail for two reasons. First, that Title IX and 34 C.F.R. § 106.41 only prohibits discrimination in an athletic program as a whole, and the complaint does not allege, nor does the evidence herein create, a question of fact that there has been any gender discrimination in the overall athletic opportunities afforded women at Colgate. Colgate maintains that the plaintiffs' allegation that its 1988 decision to retain women's ice hockey as a club sport resulted from gender discrimination does not constitute an indictment of the entire athletic program at Colgate, and therefore, Colgate is not in violation of Title IX. Second, and in the alternative, if the court rejects that argument, Colgate asserts that it would be improper to compare a women's *club* team with a men's *varsity* team. *Defendant's Trial Memorandum*, at 2. Both arguments are unpersuasive.

Colgate first contends that there has been no evidence introduced that the overall athletic program discriminates against women, and that therefore no finding can be made that they have violated Title IX. However, based upon the evidence presented, Colgate has spent far more on men's sports than women's sports over the years. Colgate now sponsors twelve varsity men's sports and eleven varsity women's sports. If football is excluded, then there are eleven varsity sports for each gender. Making a comparison of the eleven varsity sports for each gender in 1990–1991, shows a budget for men's varsity sports of $380,861.00, and for women's varsity sports of $218,-970.00. *Plaintiffs' Exhibit "11"*. With football included, (*Cf. Blair v. Washington State University*, 108 Wash.2d 558, 740 P.2d 1379 (1987) (concluding that football should be included in a comparison of athletic programs)), the total budget for men's varsity sports was $654,909.00. *Id.*[2] Many of the same sports receive comparable funding, but the overall picture is definitely in favor of the men. Therefore, it is ironic that Colgate stands behind its overall program in an effort to prevent a comparison of individual teams.

Although unequal expenditures does not by itself constitute a violation of Title IX, section 106.41 permits the Assistant Secretary to consider "the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex". 34 C.F.R. § 106.41(c).[3]

Colgate has cited no cases which limit the authority to determine whether a university offering separate sex sport's teams is violating Title IX. The Statute and Regulations, however, invite a comparison between separate teams in a particular sport because they are designed to protect not only a particular class of persons, but individuals as well.[4] Section 1681 states that "no *person* ... [shall], on the basis of sex, be excluded ... be denied ... or be subjected to discrimination ...". 20 U.S.C. § 1681(a) (emphasis added). The same is true of 34 C.F.R. § 106.41. Otherwise it would be of little consequence for a women's basketball player to know that the overall athletic program is nondiscriminatory if her team is discriminated against through funding or otherwise, in comparison to men's basketball. In a similar manner, it would be little solace for a male member of an under-funded and otherwise

---

**2.** This does not include Coach Supported Financial Aid (tuition, room, board, and jobs) which is much greater for men. *Plaintiffs' Exhibits "9" and "10"*.

**3.** *Cf. Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1130 (9th Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 79, 78 L.Ed.2d 90 (1983) (The equal protection clause is violated when there is inequality of opportunity in any given sport, even if overall athletic opportunities are equal.).

**4.** Any other conclusion would ignore the broad remedial purposes of Title IX. *Grove City College v. Bell*, 465 U.S. 555, 583, 104 S.Ct. 1211, 1226, 79 L.Ed.2d 516 (1984) (Brennan, J., dissenting in part); *see also North Haven*, 456 U.S. at 521, 102 S.Ct. at 1918 ("[I]f we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as *its* language".) (*quoting United States v. Price*, 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966).

discriminated against men's volleyball team, as opposed to a women's volleyball team, to know that the overall athletic program was technically in compliance with Title IX. *See Gomes v. Rhode Island Interscholastic League,* 469 F.Supp. 659 (D.R.I.1979), *vacated as moot,* 604 F.2d 733 (1st Cir.1979).

Colgate also argues that comparing a women's club team to a men's varsity team is comparing "apples to oranges". *See Haffer* 678 F.Supp. at 528, n. 11. However, since Colgate controls whether or not any women's club team ever becomes a varsity team, under such reasoning, simply by refusing to elevate a club team to varsity status, Colgate could always prevent an analysis or comparison of teams to determine if it was engaging in disparity of treatment to women. The operative word is *team* not "club" or "varsity". It is the women's club ice hockey *team* versus the men's varsity ice hockey *team.* Section 106.41(b) allows universities to sponsor "separate *teams* for members of each sex". (Emphasis added). Finally, section 106.-41(c) states: "unequal expenditures for male and female *teams* if a recipient operates or sponsors separate *teams* will not constitute noncompliance with this section, but ... the failure to provide necessary funds for *teams* for one sex [may be considered] in assessing equality of opportunity for members of each sex." (Emphasis added). Colgate clearly sponsors separate ice hockey *teams* for each gender. Therefore, this court has the authority to compare the two ice hockey programs.

■ The standard under Title IX provides that unless otherwise allowed, "equivalent benefit and opportunities must be provided," 44 Fed.Reg. 71421 (1979), to men and women. As stated in 34 C.F.R. § 106.41(c)(1): "In determining whether equal [athletic] opportunities are available [to men and women] ... consider ... whether the selection of sports and levels of competition effectively accommodates the interests and abilities of members of

both sexes." In making this determination, there is little guidance for the method to use in concluding whether there is a violation of Title IX. The parties have urged that the three step process for determining gender discrimination used in Title VII cases be adopted. This appears to be an appropriate approach in view of the fact that there is no direct proof of intentional discrimination by Colgate.[5]

■ Applying the Title VII method requires the application of the familiar burden shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252, 253, n. 6, 101 S.Ct. 1089, 1094, n. 6, 67 L.Ed.2d 207 (1981). Under this analysis, the plaintiff must first establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, then the burden shifts to the defendant to come forward with evidence of some legitimate nondiscriminatory reasons for its conduct. If the defendant establishes legitimate reasons for its decisions, then the plaintiffs, in order to prevail, must show that the reasons advanced by the defendant are pretextual or a coverup for a discriminatory decision.

■ Although modifying the *McDonnell–Burdine* standard, the plaintiffs, in order to establish a prima facie case, must demonstrate the following: (1) that the athletic department at Colgate is subject to the provisions of Title IX; (2) that they are entitled to the protection of Title IX; and (3) that they have not been provided "equal athletic opportunities". If plaintiffs prove a prima facie case, they will have established a rebuttable presumption that Colgate has violated Title IX. This presumption, however, will disappear from the case if Colgate comes forward with legitimate nondiscriminatory reasons for its decision not to upgrade the women's ice hockey team to varsity status. Once Colgate has introduced such evidence, in order to pre-

**5.** This is not a mixed motive case as found in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), where both

legitimate and discriminatory reasons are advanced for the defendant's decision.

**744**

vail, the plaintiffs must prove that Colgate's proffered reasons are merely a pretext.

As stated above, the parties do not dispute the contention that Colgate and its athletic department are subject to Title IX, nor has it been contested that the plaintiffs are not entitled to the protection of Title IX. Therefore, the plaintiffs must prove that Colgate has not provided them with equal athletic opportunities. It is to this determination that the court now turns its attention.

## IV. Plaintiffs' Prima Facie case.

In support of their claim that they have not been provided with equal athletic opportunities, the plaintiffs have introduced six examples in areas which they contend establish that Colgate has discriminated against them in violation of Title IX. These areas, or factors, are found in 34

C.F.R. § 106.41(c). This regulation lists a total of ten factors that the Department of Education may consider to determine if equal athletic opportunities are available to both sexes. 34 C.F.R. § 106.41(c)(1–10).

### 1. *Expenditures.*

The basic claim for discrimination between the women's club team and the men's varsity team is the difference in financial support received by each from Colgate. Evidence has been submitted for the years 1985–86 through 1990–1991. The court will use the last year (1990/91) to illustrate the difference in funding between the two teams. *Plaintiffs' Exhibits "7", "11", "12" and "13".* The other years produce similar results. The chart below sets forth the 1990/91 budget[6] for the men's varsity hockey team and the women's club ice hockey team.

| Men | | Women | |
|---|---|---|---|
| Expenses | $129,397.00 | Budget allocation | $4,080.00 |
| Support group | 22,664.00 | Championships | 520.00 |
| Coaches' salaries | 58,500.00 | | |
| | 28,000.00 | | |
| Total | $238,561.00 | Total | $4,600.00 |

In other words, for 1990/91, men's ice hockey players received fifty times the financial support from the university as the women's ice hockey players. The women receive 2% of the men's funding for ice hockey.[7] In addition, the women had to pay dues of $25.00 (now $30.00) per year to be on the team. The men did not have to make any such payment.

### 2. *Equipment.*

The men's ice hockey players are outfitted with uniforms, skates, pads, helmets, and gloves. A machine is available with

someone to sharpen their skates at any time free of charge. They are provided with as many sticks as needed, and any broken equipment is immediately replaced. In contrast, the women's ice hockey players supply their own skates at a cost of approximately $160.00 each, and have to pay someone between $2.00 and $3.00 to have them sharpened. One year they purchased an old skate sharpening machine from the men, but it never worked properly, and then it disappeared. They often had to use old and inadequate equipment, and attempted to get along with two hockey sticks per year. At one time, they even

**6.** The actual 1990/91 budgets for "support group" and "coaches salary" were not introduced into evidence. Therefore, the Court has used the budget for the last year available, 1989/90, with the assumption that these amounts either remained the same or increased.

**7.** This does not include the $327,616.00 Coach Supported Financial Aid for eighteen men hockey players. The women's hockey team, as a nonvarsity sport, received no such aid. *Plaintiffs' Exhibit "9".*

had the indignity of having the initials "INT" (Intramural) inadvertently painted on new hockey helmets which they had to purchase from their budget.

### 3. *Locker room facilities.*

The men's locker room was described as very large (50' × 50'), with all of the amenities associated with a Division I varsity program. It had carpeting, director chairs, individual lockers, and a stereo. In contrast, the women's locker room was very small (15' × 15'), and was shared with other teams. It was generally described as being inadequate and below par.

### 4. *Travel.*

The men's ice hockey team traveled on buses with a commercial driver. The players stayed in comfortable accommodations on overnight trips. All travel arrangements were made by support personnel. In contrast, the women's ice hockey team had to pay Colgate $.25 per mile to rent a van to travel. The women had to provide their own driver, usually a player who had applied for and received a chauffeur's license. The women had to make their own travel arrangements. On most overnight trips, the women stayed at the homes of parents or family of team members. On only one trip a year could they afford to stay in a motel.

### 5. *Practice times.*

The men were given prime practice times every weekday from 3:00 to 6:00 P.M. The men also have priority for extra practice when needed, or in the event of an upcoming important game. In contrast, the women were allocated the poorest practice times, to wit, 7:30 to 9:00 P.M. on Monday, Wednesday, and Friday, and 4:00 to 6:00 P.M. on Sunday. Often, the women's practice time would be preempted by the men or other activities.

### 6. *Coaching.*

The men's team had a full-time head coach and one full-time assistant coach.

During the 1989/90 season, the coaches were paid a total of $86,500.00. In the past year, an additional full-time assistant coach has been added. In contrast, the women's team has been coached by volunteer students who were paid a few hundred dollars a year from their budget.

### V. Summary.

The above are only a very few examples of the disparity in treatment afforded to the women's ice hockey players as opposed to the men ice hockey players at Colgate. In effect, the women hockey players were on their own to provide their equipment, and to make their own schedule and travel arrangements with little financial or other assistance from the university. It is incredible that Colgate even charged the women $.25 per mile to use a school van in order to travel to away games. This money came from the funds provided by the university.[8] On the other hand, the men's hockey players had everything given to them. All they had to do was concentrate on playing the game. They did not have to be concerned with such trivial details as practice times, scheduling, travel, accommodations, or coaches. The men's ice hockey players at Colgate are treated as princes. The women ice hockey players are treated as chimney sweeps. Therefore, the plaintiffs have made a prima facie case of unequal treatment because of gender, and Colgate is presumed to be in violation of Title IX.

The court will now discuss whether Colgate is justified in such treatment.

### VI. Colgate's legitimate nondiscriminatory reasons.

As noted on pages 4 and 5 of this Decision, Colgate has advanced six reasons to deny women equal treatment with regard to its ice hockey programs. In its letter to the women's club ice hockey team on November 14, 1988, Colgate stated: "The ... request for varsity status for women's ice hockey has been denied ... (for) many of the same reasons outlined in the May 1983 decision." *Plaintiffs' Exhibit "4"*. In

---

**8.** What the University giveth, it taketh away.

1983 and 1986, Colgate gave the same four reasons for its decision. *Plaintiffs' Exhibits "1" and "3"*. At trial, Colgate produced the two additional reasons. The court will consider each reason separately.

### 1. *Women's ice hockey is rarely played on the secondary level.*

■ First, Colgate contends that since women's ice hockey is rarely played at the secondary level, there is an insufficient pool of qualified athletes to maintain a varsity program. In support of this reason, Colgate points to the fact that women's ice hockey is played primarily in prep schools, with about thirty-four prep schools in New England offering girls' ice hockey, as opposed to only one public high school. This is coupled with the fact that seventy-five percent (75%) of the students who attend Colgate come from public high schools. It was the opinion of the former Director of Athletics that this was an insufficient number of "feeder" schools to support a women's varsity ice hockey team.

The plaintiffs presented Mr. Carlton Gray, a member of U.S.A. Hockey, and second vice president of U.S.A. Hockey in the State of Massachusetts.[9] Mr. Gray is one of five people coordinating women's hockey for U.S.A. Hockey. He testified that there are between 175 and 200 women's U.S.A. Hockey teams nationally. There are thirty-one teams in Massachusetts alone; with other teams in Minnesota, Wisconsin, New York, Michigan, Alabama, Maine, Rhode Island, and Connecticut. He estimated there are between 6,000 and 6,500 women participating in U.S.A. Hockey programs.

The plaintiffs also presented Mr. Russell J. McCurdy the head coach of the women's varsity ice hockey team at the University of New Hampshire. Mr. McCurdy has been a recruiter for the women's varsity ice hockey team since 1977. He testified that his recruiting area consists of over thirty New England prep schools and the approximately 175 to 200 U.S.A. Hockey teams; together with girls playing in Canada on

Junior A and Junior B teams. He also testified there are many talented girls on boys' teams in those areas of this country which do not have girls' ice hockey teams. Moreover, Lee Hunsaker, the Bowdoin College varsity women's ice hockey coach, testified that there are 400–450 girl prep ice hockey players in New England alone. Finally, all the witnesses agreed that there are thousands of scholastic age girl ice hockey players in Canada.

In rebuttal, Colgate claims its women varsity players would have to come from public schools, and that since only one public school in the northeast plays girls' ice hockey, recruitment would be almost impossible. However, Mr. McCurdy reviewed the men's varsity ice hockey roster for 1989/90, and it did not reveal *one single player* who played ice hockey in a public high school. In fact, all of the American men players were from either prep schools or played on teams in the Amateur Hockey Association. In addition, out of the twenty-four members on the squad, sixteen were from Canadian towns which had girls' and women's teams. In 1990/91, the men's roster included nineteen players from Canada (again from areas which have girls' and women's teams), and six from the United States; out of those six, only one played interscholastic hockey at a public high school, and that was from Minnesota.

Therefore, over a two year period, only one member on the men's varsity ice hockey team came from a public high school program. It is obvious that public high schools are not "feeder" programs for the men's varsity ice hockey team. There is no reason why a different standard should be applied to the women's ice hockey team. Although women ice hockey players on the secondary level obviously are not as plentiful as men, it is clear that a competitive women's varsity ice hockey team can easily be recruited from the schools and teams of the northeastern United States and Canada. The court finds that this reason advanced by Colgate is not legitimate, but is a pretext.

---

**9.** U.S.A. Hockey is the governing body that coordinates and sanctions all amateur hockey in this country under the auspices of the International Ice Hockey Federation.

2. *A Women's Championship is not sponsored by the NCAA at any intercollegiate level.*

Second, Colgate contends that since the NCAA does not recognize, sanction, or sponsor women's ice hockey, it would be impractical for Colgate to sponsor a women's varsity team. However, the ECAC, a conference within the NCAA, does offer a women's ice hockey championship to its member colleges in both Division I and Division III. Colgate is a member of the ECAC,[10] and the men's varsity ice hockey team competes for the championship each year. It is difficult to accept that Colgate should be allowed to continue to engage in unequal treatment of women because the NCAA governing body refuses to recognize a particular sport, while the conference in which Colgate is a member does. Sixteen other universities in the northeast have not found this position by the NCAA a hinderance in moving to provide equivalent benefits and opportunities to its women ice hockey players. Neither should Colgate. If the NCAA should suddenly decide to discontinue its national championship in men's ice hockey, would Colgate reduce its men's ice hockey team to club status? Of course not.

Colgate presently sponsors a total of twenty-three varsity sports. It did not introduce any evidence that there is an NCAA sponsored championship in each and every varsity sport. Therefore, some of the varsity sports presently sponsored by Colgate may not have an NCAA championship, but they are still successful and an integral part of the university.

In any event, in view of the fact that there is a legitimate and prestigious championship available for a Colgate varsity women's ice hockey team to compete, the position of the NCAA can not stand in the way of equivalent treatment. If a women's varsity ice hockey team should win an ECAC trophy, it would be proudly displayed in the Colgate trophy case. The court finds that Colgate's refusal to spon-

sor a women's varsity team merely because the NCAA does not recognize a championship for women's ice hockey is not a legitimate reason, but is a pretext.

3. *The game is only played at approximately fifteen colleges in the east.*

Third, Colgate contends that since only fifteen colleges and universities in the northeast sponsor women's ice hockey, there is not enough competition to justify a varsity team. In fact, there are sixteen women's varsity ice hockey teams in the northeast. These are some of the most prestigious and outstanding universities not only in this country, but in the world. The roster of these schools is breathtaking, and Colgate is a university of equal caliber. Amherst College, Bowdoin College, Brown University, Colby College, Cornell University, Dartmouth College, Harvard University, Middlebury College, University of New Hampshire, Northeastern University, Princeton University, Providence College, Rochester Institute of Technology, St. Lawrence University, Wesleyan University, and Yale University complete the list. All of these universities and colleges are within a convenient one day or overnight traveling distance from Hamilton, New York. Three are in New York State. Home and away games with each varsity team would result in a thirty-two game regular season schedule. This does not even take into consideration the teams in Canada, or the eleven other northeast universities that play women's club ice hockey which could be scheduled for an occasional game. The fact that there are only sixteen women's ice hockey teams in the northeast available for scheduling is not a legitimate reason to deny varsity status to the women's ice hockey team. It is but another pretext.

4. *Lack of student interest.*

Forth, Colgate contends that there is a lack of student interest in women's ice hockey as revealed in biannual surveys of the student population, admission office in-

---

**10.** The former Director of Athletics reported to the Committee on Athletics extensively about an ECAC meeting he attended in October 1988. The ECAC appears to determine Colgate's scheduling in all sports. *Defendants' Exhibit "B".*

terviews with prospective students, and the fact that in 1988, with a women's applicant pool of 3,089 students, only twenty-nine indicated that they had played ice hockey at the secondary level. The actual surveys were not introduced into evidence, so there is no comparison with any student interest there might have been in other sports; for example, in the women's varsity tennis program or in the men's varsity golf program. Also, lack of student interest was not mentioned as a reason in any of the years in which the women's ice hockey program was denied varsity status. Everyone seems to agree that those playing on the women's ice hockey team have a fervent interest in the sport. In fact, three team members appeared before the Committee on Athletics to plead their case for varsity status. Their persistence in making four applications and commencing this lawsuit certainly shows an interest. This is particularly true in view of the many obstacles they have had to overcome.

The number of applicants to Colgate who indicated they played interscholastic hockey increased from thirteen in 1982 to twenty-nine in 1988. *Defendants' Exhibit "H"*. This would seem to indicate that not only is the pool of available women's ice hockey talent increasing, but also that student interest may be on the rise. Furthermore, these statistics were the minimum number of prospective women students who had played scholastic ice hockey, since there may be other students who played scholastic ice hockey but did not list it on their application. In addition, Colgate should not expect an overwhelming number of women who played ice hockey at the secondary level to attend Colgate, especially if they wish to continue playing at the collegiate level. The lack of a varsity team at Colgate will discourage such women players from attending Colgate.

Finally, there has been thirty to forty women students going out for the club team each year. This is surprising in view of little funding, publicity, or promotion of the program, and the fact that the players must pay dues to remain on the team. There must be some interest in the women's ice hockey program since its small funding is, in fact, the largest of any sports club at Colgate. Out of the eighteen to twenty club teams, the women's ice hockey team seems to have the most student interest.[11] There may not be great interest in women's ice hockey at Colgate, but there is certainly enough interest to support a varsity team. Moreover, plaintiffs point to the fact that women's track and field was made a varsity team, and yet had to forfeit meets against other teams because of lack of student interest. Therefore, the defendants have not produced sufficient evidence to demonstrate that lack of student interest is a legitimate reason to deny equality to the women's ice hockey players. The court finds this is also a pretext.

### 5. *Lack of ability.*

Fifth, Colgate contends that the women on the club team do not possess the ability to be a varsity team. In that regard, the former Director of Athletics and one of the present Assistant Directors of Athletics both testified that the caliber of play for the women's club ice hockey team was below that which could be expected in a varsity level program. This is not surprising. It is not a varsity team. It has not been funded or recruited as a varsity team. It has not had *any* of the advantages of a varsity team. To expect these women to have varsity team abilities in the face of the difficulties which have been against them as outlined above would not be realistic. If you demand that a club team reach varsity ability before making it a varsity team, it will never reach that level. With student coaches, no recruiting budget, and very limited financial support, the women cannot be expected to achieve such status. It takes a few years after a sport reaches varsity status before the team can be considered competitive. A university should look for the foundation upon which to build a varsity program.

---

**11.** Even in 1983, the memorandum from the Division of Physical Education, Recreation and Athletics to the Committee on Athletics, referred to the "many [female] students who have played, and continue to play ice hockey at Colgate." *Plaintiffs' Exhibit "1"*.

In addition, the opinions offered by the two members of the Colgate Athletic Department concerning the ability of the women's club ice hockey teams are viewed with great reservation. Neither of them had ever watched the women play for any period of time, or in any detail. Both demonstrated a bias against women's ice hockey in general. A woman member of the Committee of Athletics which turned the women down in 1983, and who is now an Assistant Athletic Director, had never even seen them play. In fact, it appears that none of the members on any of the committees had any real knowledge of the abilities of the women players except what may have been told to them by the former Director of Athletics, who admitted, "I am not a women's ice hockey fan." This may explain why, in previous years, the lack of ability of the women's team was never given as a reason for denying any of the four applications.

In contrast, Mr. Hunsaker, the head hockey coach at Bowdoin College, found the Colgate women's team to be competitive with all Division III teams and one or two Division I teams in the ECAC. He testified that with proper resources, the team would improve each year. This is the natural evolution from intramural to club to varsity.[12]

Finally, the team was runner-up in the club championship one year and the champion the next year. The team has played varsity teams, including Division I—Cornell, Princeton, and Yale; and Division III—Colby, Middlebury, Bowdoin, and Wesleyan. It had at least four straight winning teams, and had a 10–7 record in the 1988/89 season.

The interest, ability, and perseverance shown by the plaintiffs and their fellow teammates, have laid a solid foundation for a women's varsity ice hockey program at Colgate. The proffered "lack of ability" is

not a legitimate reason to deny varsity status, but is merely a pretext.

In summary, all of the above five reasons produced by Colgate to deny equality to the women's ice hockey players are factors which are not going to change to any significant degree in the near future. The number of girls playing ice hockey at the secondary school level in prep, public, amateur, or in Canada, will probably increase. But it does not make a difference whether there are 6,000 women available to recruit, or 9,000, the present pool of women provides for a more than sufficient base for recruiting qualified players. Even if the NCAA does not sponsor a women's ice hockey national championship, the ECAC provides a varsity league and its championship presents a great challenge. The sixteen schools in the northeast with varsity teams are more than sufficient to provide competition. Without proper university support, the student interest and players' ability can only go so far. This is the same situation faced by the other schools in the northeast, and they do not deny women's ice hockey players varsity status, but have sponsored apparently thriving programs. Therefore, the court can only conclude that all of the above reasons are not legitimate reasons to deny equality, but must be considered a pretext for discrimination in violation of Title IX.

The court will now turn its attention to the only real reason why the women have been denied a varsity ice hockey team at Colgate.

### 6. *Hockey is expensive to fund.*

Finally, Colgate contends that it is too expensive to fund a women's ice hockey team in light of all the other teams it now sponsors. There is no question that if the women's ice hockey program is elevated from club to varsity, it will have a financial impact on Colgate. This is the only real reason why the four applications have been

---

12. Even an inquiry to plaintiff Cook at the November 7, 1988, meeting acknowledges that the team's ability would vastly improve with a move to varsity status. She was asked by a member of the Committee on Athletics, "If the women's ice hockey club team realized the many benefits they would lose out on if the team had varsity status, *i.e.*, 'walk-ons' who make the club team may not make the varsity team because as a varsity sport, positions would be highly competitive." *Defendants' Exhibit "C".*

denied, and is demonstrated throughout the minutes of the various committee meetings and reports. If the women's ice hockey program could be sponsored for a minimum sum, it would probably have been approved in 1979, or at the latest, by 1983. However, it is a costly program, and this was explicitly recognized by the Committee. on Athletics, and by the former Director of Athletics. Although not given varsity status in 1983, women's squash received more favorable treatment because, "It will not require a large budget." *Plaintiffs' Exhibit "1".* At the committee meeting on November 7, 1988, the Dean of the Facility stated that, "Colgate would have to supply the team with the same courtesies as the men's team, thereby substantially increasing the proposed budget by Ms. Cook." *Defendants' Exhibit "C".* A representative from admissions said, "With every new sport, the job of admissions staff increases, and noted that they are already handling twenty-one varsity sports.... If two new sports were given varsity status, three financial aid awards would need to be reserved, and this would mean a $100,000.00 commitment." *Defendants' Exhibit "C".*

Although Colgate's financial considerations are not a pretext, "It is clear that financial concerns alone cannot justify gender discrimination." *Haffer,* 678 F.Supp. at 530. Otherwise, if schools could use financial concerns as a sole reason for disparity of treatment, Title IX would become meaningless. Under such circumstances, a school could always use a lack of funds as an excuse to deny equality because it costs money to implement equivalent women's programs with long standing men's programs. This cannot be either the spirit or meaning of Title IX.

History shows that it is not easy to achieve equality. No one said that making things equal would not require some pain and sacrifice. The budget proposed by the plaintiffs in 1988 is probably unrealistic at this time. There is, however, no requirement that the funding be equal for both

teams, but Colgate must provide equivalent benefits and opportunities. In this era of more limited resources, it may come down to taking from the men and giving to the women. The men have been given so much, a little "spreading of the wealth" is appropriate.

To demonstrate that financial reasons are in fact the only real reasons Colgate advances to deny equality, one need only to look at the memorandum from the Division of Physical Education Recreation and Athletics to the Committee on Athletics dated May 12, 1983. *Plaintiffs' Exhibit "1".* The opinion expressed at that time was carried over to 1988, and presented to this court, to wit: *"Considered against the needs of the total women's athletic program at Colgate, it is the Division's opinion that women's intercollegiate ice hockey is a luxury that we can not afford at this time."* (Emphasis added).[13] It refers to funding for women's ice hockey as a "luxury". Colgate spent $566,177.00 [14] in 1990/91 for the men's ice hockey team and did not consider it a luxury, but refused to increase spending for women ice hockey players because it was a luxury the university could not afford.

Equal athletic treatment is not a luxury. It is not a luxury to grant equivalent benefits and opportunities to women. It is not a luxury to comply with the law. Equality and justice are not luxuries. They are essential elements which are woven into the very fiber of this country. They are essential elements now codified under Title IX. Many institutions of higher education apparently hold the opinion that providing equality to women in athletics is both a luxury and a burden. The feeling seems to be that to afford such equality to women is a gift and not a right. The women's ice hockey players do not want a gift. They obviously do not consider equivalent treatment to be a luxury. The women only want equal athletic opportunities. That is what the law demands. Whether this requires new monies or reallocation of present resources is a decision which must be

---

**13.** It should be noted that only the funding of the *women's* athletic program at Colgate is mentioned, and not the overall athletic program.

**14.** This figure includes the Coaches Supported Financial Aid.

made by Colgate. In view of the enormous advantages given to the men's varsity ice hockey team, to implement a women's varsity ice hockey program which provides basic equipment, coaches, facilities, scheduling, travel, and other accommodations, is little enough to expect of a fine university. The granting of equivalent benefits and opportunities to all students entering Colgate, including women ice hockey players, is required under the law and facts of this case.

VII. Conclusion.

In 1983, the Committee on Athletics "agreed that the women's ice hockey program should continue as a club sport in the *immediate* future." (Emphasis added.) *Plaintiffs' Exhibit "2".* It is now nine years into the future. Since that time, the funding for the men's program has increased dramatically. In 1983 dollars, funding of the women's program has actually decreased. Nothing else has changed. Unfortunately, since Colgate is unwilling to make a change, it is the duty of this court to order change. The immediate future has come and gone. The time for change is now. The court finds that Colgate is in violation of Title IX by not providing equal athletic opportunities to its women's ice hockey players. Therefore, Colgate is ordered to grant the women's ice hockey team varsity status and to provide the team all the amenities that accompany such a designation.[15]

The plaintiffs have also urged that the court set forth details as to what Colgate must do to make the two hockey programs equivalent. The court declines this invitation. The women ice hockey players are entitled to "equal opportunity", but not necessarily "equal funding". The criteria is clearly set forth at 34 C.F.R. § 106.41(c) on page 741 of this opinion.

The plaintiffs have requested that this court also award compensatory damages. The plaintiffs' evidence does not, however, support such an award. They were, or should have been, aware of the club status of women's ice hockey when they entered Colgate. Being aware of the circumstances, they voluntarily expended time, money, and effort to the program. Despite the hardships, the players reaped benefits which outweighed any losses. The experiences were worth the money. Also, the proof as to actual monetary amounts expended is vague and insufficient as a matter of law.

Finally, the court suggests that the parties may wish to examine the programs at Harvard, R.I.T., Wesleyan, or the other universities that have apparently provided "equal athletic opportunities" to its men and women ice hockey players as a guideline for making the support decisions for each team. The court will not, at this time, go farther in implementing this order. The good faith and the good will of the parties should be sufficient to insure that all students—men and women—and all ice hockey players—men and women—are treated fairly.

Accordingly, it is

ORDERED, that Colgate is directed to grant varsity status to the women's ice hockey program starting with the 1993/94 school year, and to provide equivalent athletic opportunities for the women's ice hockey players in accordance with the law; and it is further

ORDERED, that the plaintiffs' demand for compensatory damages is denied; and it is further

ORDERED, that plaintiffs' attorney may file and serve, pursuant to 42 U.S.C. § 1988, an application for legal fees within thirty (30) days from the filing and service of this Memorandum–Decision and Order. Defendants shall file and serve their objections, if any, within thirty (30) days thereafter. The parties are encouraged to settle the attorneys' fees issue.

IT IS SO ORDERED.

---

**15.** In light of this disposition, the court did not reach plaintiffs' claim that Colgate's actions violated the Fourteenth Amendment. Resolution of this claim would not provide the plaintiffs with any further relief.